Argued and submitted June 12, 2001, affirmed in part; otherwise reversed and remanded for further proceedings March 13, 2002

# STATE OF OREGON,
*Appellant,*

*v.*

# STEVE CARDELL,
*Respondent.*

## 98-2706; A105750

41 P3d 1111

Frederick L. Bennett, Judge pro tempore.

Laura S. Anderson, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Alan D. Reynoldson argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

Order affirmed as to evidence obtained from search of tires; otherwise reversed and remanded for further proceedings.

## LINDER, J.

Defendant was charged with driving under the influence of intoxicants (DUII), ORS 813.010, and moved to suppress, among other things, the results of field sobriety and Breathalyzer tests that he took after the police questioned him. The trial court granted defendant's motion, concluding that the investigating police officer's touching of defendant's car tires—to determine if they were hot—was an unlawful search under Article I, section 9, of the Oregon Constitution,[1] and that all evidence obtained after that search should be suppressed. We affirm in part, reverse in part, and remand.

The facts are largely undisputed. The Toledo Police Department received an anonymous report that a car was "racing" in the area of 10th and A streets. Officer Gillespie, who was at the station when the call came in, left the station and proceeded to that general area. While en route, Gillespie received a dispatch relaying the fact that the suspect car was a blue Pontiac GTO. He arrived three to five minutes later and saw a car matching the description parked in the driveway of a home on the west side of A Street. Toledo is a small town, and Gillespie had seen a car matching that description on a number of prior occasions. He also knew that defendant owned a blue GTO, and he previously had spoken to defendant at the home on A Street.

Gillespie walked up the driveway on his way to the front door of the residence. As he was passing the car, he stopped and felt the rear tires to determine if they were hot. In Gillespie's opinion, the tires were hotter than they would be due to normal driving and the slippage of the tires on the road likely had caused the tires to become that hot.

After touching the tires, Gillespie proceeded to the door of the residence. The record is silent as to what, specifically, occurred when the residents answered the door, other

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

than to show in the most general terms that Gillespie spoke with defendant, defendant's girlfriend, and defendant's girlfriend's mother. Based on Gillespie's observations and his communications with all three parties, he concluded that defendant had been driving the blue GTO and that he had done so while under the influence of alcohol. After administering field sobriety tests, Gillespie arrested defendant and transported him to the police station. At the police station, the police administered a Breathalyzer test.

Before trial, defendant moved to suppress "all observations, statements, admissions, tests or confessions of the accused, and the fruits thereof." His principal contention was that Gillespie's touching of the tires was a warrantless search that violated Article I, section 9, of the Oregon Constitution. He argued that the court should suppress all evidence that the police obtained after that illegal search, because it was obtained through exploitation of the illegal search of the tires. The trial court agreed that touching the tires was an unlawful search. The trial court also concluded that the state bore the burden to prove that the evidence obtained after that illegal search, including the field sobriety and Breathalyzer tests, was not derived from the illegal search of the tires. The trial court determined that the state did not produce evidence to satisfy its burden in that regard and, consequently, it granted defendant's motion to suppress.

On appeal, the state assigns error to the trial court's suppression order. We review that order for errors of law. *State v. Stroup*, 147 Or App 118, 120, 935 P2d 438 (1997). In reviewing the order, we are bound by the trial court's findings of historical fact if they are supported by evidence in the record. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). If the trial court failed to make findings on particular issues, we presume that it decided the facts in a manner consistent with its ultimate conclusion relating to the lawfulness of the search. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993).

We begin with whether Gillespie's touching of the tires was a search under Article I, section 9, of the Oregon Constitution.[2] As earlier described, when Gillespie touched

___

[2] As discussed below, the trial court granted defendant's motion to suppress, in part, pursuant to *former* ORS 133.683. That statute required the suppression of

the tires, the car was parked in the driveway of the home. In walking past the car, Gillespie did nothing unlawful. Visitors, including the police, have implied consent to enter the driveways and front yards of homes, in the absence of some overt action by the residents to exclude them. As we reasoned in *State v. Ohling*, 70 Or App 249, 253, 688 P2d 1384, *rev den* 298 Or 334 (1984):

> "Going to the front door and knocking [is] not a trespass. Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to the front doors of residences on a more or less regular basis. Doing so is so common in this society that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion."

Whether officer Gillespie could touch the tires, however, is a distinct and different issue. The scope of a homeowner's implied consent to approach the home is limited to those acts reasonably undertaken to contact the residents of the home; such consent does not extend, for instance, to an exploratory search of the curtilege. *See State v. Somfleth*, 168 Or App 414, 425, 8 P3d 221 (2000) (officers' conduct in going to the defendant's back door unlawfully invaded the curtilege of the defendant's home).[3]

*State v. Portrey*, 134 Or App 460, 896 P2d 7 (1995), is closely analogous. There, police walked to the defendants' front porch on a matter related to a recent burglary. While on

evidence obtained in violation of both the Oregon Constitution and the United States Constitution. *Compare State v. Mulholland*, 132 Or App 399, 405, 888 P2d 594 (1993), *rev den* 321 Or 284 (1995) (analyzing search under Article I, section 9, of the Oregon Constitution, for purposes of ORS 133.683), *with State v. Miller*, 300 Or 203, 228-29, 709 P2d 225 (1985), *cert den* 475 US 1141 (1986) (same, with respect to the Fourth Amendment to the United States Constitution). Because we conclude that Gillespie's action was a search that violated defendant's rights under Article I, section 9, of the Oregon Constitution, we do not separately address whether that police action also would be a search under the Fourth Amendment to the United States Constitution.

[3] *See also State v. Donahue*, 93 Or App 341, 345, 762 P2d 1022 (1988), *rev den* 307 Or 303 (1989) (police officer acted unlawfully when he accompanied a meter reader onto the defendant's property, because the implied permission to enter the property near the meter extended to the meter reader and did not also extend to the police or to the general public); *Ohling*, 70 Or App at 253 ("Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so.").

the porch, one of the officers observed a pair of boots. The officer turned the boots over to inspect the soles and to determine if the soles matched the shoe prints left at the scene of the crime. Based on his observations, the officer sought and obtained a warrant to search the defendants' home. On appeal, we held that the officer's action was a search that exceeded the scope of the occupants' consent to enter the property:

> "[T]he intrusion to which an occupant impliedly consents is limited. One may expect that visitors will stand on the front porch for the purpose of engaging in conversation, but that does not mean that it is expected that visitors will pick up items on the front porch and examine what is not in view. By impliedly consenting to one form of intrusion, an occupant does not necessarily consent to being subjected to other forms of scrutiny as well.
>
> "In this case, defendant's privacy interest continued in the articles on his front porch that were not entirely visible to someone standing there, even though he had impliedly consented to visitors coming to his front door. The officers' actions intruded on a privacy interest defendant maintained in the area around his front door to which defendant had not impliedly or expressly consented."

*Id.* at 465-66 (citations omitted).

In this case, to reach the front door of the residence, Gillespie had to walk up the driveway and past the suspect vehicle. He had implied consent to do so. As did the officer in *Portrey*, however, Gillespie exceeded that consent when he touched the tires in an attempt to obtain information that would aid him in his investigation. The trial court correctly ruled that Gillespie's touching of the tires was an illegal search and that the direct information that he obtained—*i.e.,* that the tires were hot—should be excluded.

As it did at the hearing on the motion to suppress, the state argues alternatively that, even if Gillespie's touching of the tires was a search, it was valid despite the lack of a warrant because it was supported by probable cause and exigent circumstances. The trial court concluded that, had Gillespie encountered the car on the road, he would not have

had reasonable suspicion to stop the car. Because the standard for reasonable suspicion is lower than the standard for probable cause, the trial court necessarily rejected the state's probable cause argument when it concluded that Gillespie lacked even reasonable suspicion.

■■■ The state has the burden to establish by a preponderance of evidence that a warrantless search is valid. ORS 133.693(4). One means of establishing the validity of such a search is through probable cause and exigent circumstances. *State v. Moylett*, 313 Or 540, 548, 836 P2d 1329 (1992). Probable cause "means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." ORS 131.005(11). To satisfy that standard, an officer must subjectively believe that a crime has been committed and that belief must be objectively reasonable in the circumstances. *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986). We test probable cause based on the totality of the circumstances and not on isolated facts. *State v. Cole/Hood*, 87 Or App 93, 97, 741 P2d 525, *rev den* 304 Or 280 (1987).

■■■ As earlier described, Gillespie went to the residence where the blue GTO was parked and touched the tires of defendant's car in response to a police dispatch. That dispatch was based on an anonymous tip. An anonymous informant's report that lacks detail as to the basis of the informant's knowledge is not enough, standing alone, to satisfy the less rigorous standard of reasonable suspicion. *State v. Black*, 80 Or App 12, 16, 721 P2d 842 (1986). In *Black*, for example, an anonymous caller reported that a car was "speeding and weaving" on Highway 199. A state trooper responded to that call and spotted the car. The car, however, was not speeding or driving erratically when the trooper observed it. The trooper stopped the car and, ultimately, arrested the driver for DUII. We reasoned that the state trooper could not have formed reasonable suspicion based on information supplied by an unnamed person who did not provide the basis of his or her knowledge. *Id.* Specifically:

"It cannot be successfully argued that the trooper in this case could have reasonably suspected that defendant had committed a crime merely because he could have assumed

that the dispatcher's information was based on a reliable source."

*Id.*[4]

Here, the state did not establish that the caller's name was taken, or that the caller had some basis for the information, *e.g.,* that he or she personally had observed the blue GTO "racing." If Gillespie had encountered the blue GTO being driven lawfully on the street, rather than parked in a driveway, we would be constrained to conclude that Gillespie did not have reasonable suspicion to stop the car. *See Black*, 80 Or App at 16. Necessarily, then, even assuming exigent circumstances, Gillespie did not have probable cause to search the tires.[5] Thus, the trial court correctly concluded that the search of the tires was not permissible under the exigency exception to the warrant requirement.

The remaining question is whether all of the evidence that the police obtained after Gillespie went to the door and contacted the residents should have been suppressed on the ground that it was derived from the earlier illegal search of the tires. We begin with the relevant statutory analysis. *See State v. Nielsen*, 316 Or 611, 618, 853 P2d 256 (1993) (we first consider arguments under the pertinent statute before reaching constitutional issues).

The trial court suppressed the state's evidence under *former* ORS 133.683,[6] which provided:

---

[4] *See also State v. Dahl*, 323 Or 199, 210, 915 P2d 979 (1996) ("The anonymous telephone call appropriately triggered police investigation, but no legitimate part of that investigation ever ripened into either a warrant based on probable cause to believe that defendant had committed a crime or such probable cause plus exigent circumstances.").

[5] *See State v. Ricks*, 166 Or App 436, 441, 998 P2d 234, *rev den* 331 Or 429 (2000) (" 'Reasonable suspicion' to stop a person is a lesser standard than 'probable cause.' "); *see also State v. Hammonds/Deshler*, 155 Or App 622, 627, 964 P2d 1094 (1998) (the Supreme Court's probable cause reasoning is equally applicable to cases involving the lower standard of reasonable suspicion).

[6] *Former* ORS 133.683 was repealed by Senate Bill 936, Or Laws 1997, ch 313, § 37, effective July 1, 1999. Because this case arose before July 1, 1999, the repeal does not affect it.

"If a search or seizure is carried out in such a manner that things seized in the course of the search would be subject to suppression, and if as a result of such search or seizure other evidence is discovered subsequently and offered against defendant, such evidence shall be subject to a motion to suppress unless the prosecution establishes by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure, and the court finds that exclusion of such evidence is not necessary to deter violations of ORS 133.525 to 133.703."

That statute codified the federal "fruit of the poisonous tree" doctrine. *See State v. Quinn*, 290 Or 383, 395, 623 P2d 630 (1981) (citing Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Procedure Code, Final Draft and Report (November 1972), § 167.[7] That doctrine, in general terms, requires the suppression not only of the primary evidence discovered through illegal police conduct but also the secondary evidence subsequently derived from that prior police illegality. *See generally Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963) (discussing doctrine).[8] Not all secondary evidence that police discover, however, warrants suppression. *Id.* at 487-88. Rather, as articulated in *Wong Sun*:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

---

[7] As an example of the statute's application, the Commentary explains:

"If the police illegally seize a notebook which contains information which leads to other evidence which they in due course seize under a search warrant, the section, based on the 'fruit of the poisonous tree' doctrine, would allow the defendant to suppress such evidence."

*Id.* at 107.

[8] *See also* Wayne R. LaFave, 5 *Search and Seizure* § 11.4(b), 231-32 (3d ed 1996) (describing evidence directly obtained by police illegality as "primary," and evidence police subsequently discover as "secondary").

*Id.*; *see also State v. Kennedy*, 290 Or 493, 500, 624 P2d 99 (1981) (observing that *Wong Sun* rejected "but for" causation as the touchstone for suppression of secondary evidence).

A defendant, as the party seeking to suppress secondary evidence on the theory that it was derived from prior illegal police conduct, has the initial burden of establishing a sufficient factual nexus between the prior illegality and the secondary evidence. *Alderman v. United States*, 394 US 165, 183, 89 S Ct 961, 22 L Ed 2d 176 (1967);[9] *United States v. Nava-Ramirez*, 210 F3d 1128, 1131 (10th Cir 2000), *cert den* 531 US 887 (2000). Once the defendant has established that factual nexus, the burden shifts to the government to demonstrate that the challenged evidence is not derivative of that prior illegality.[10] *Alderman*, 394 US at 183; *United States v. Kandik*, 633 F2d 1334, 1335 (9th Cir 1980). Our initial task, therefore, is to determine whether defendant met his burden of establishing the requisite factual nexus between the secondary evidence and the illegal search of his tires.

As we concluded above, the trial court correctly concluded that touching the tires was an illegal search, and the court excluded the evidence directly obtained from that search (*i.e.*, the knowledge that the tires were hot). The officer's conduct in touching the tires thus is the predicate illegality that *former* ORS 133.683 requires. After concluding that the primary evidence should be suppressed, the trial court additionally suppressed all the evidence that the police

---

[9] *Alderman* was decided before the legislature enacted ORS 133.683 and relied on federal law dating back to 1939. *See Alderman*, 294 US at 183 (citing *Nardone v. United States*, 308 US 338, 341-42, 60 S Ct 266, 84 L Ed 307(1939)). It therefore provides relevant context for the legislature's understanding of which party bears the burden to establish that a primary illegality tainted subsequently obtained evidence. *See State v. Cooper*, 319 Or 162, 167-68, 874 P2d 822 (1994) (cases discussing law from another jurisdiction provide context for the Oregon Legislature's adoption of that jurisdiction's law). *See generally Quinn*, 290 Or at 395 ("The intention of the drafters [of ORS 133.683] was to codify 'fairly well-established concepts,' and particularly the constitutional 'fruit of the poisonous tree' doctrine[.]"). We cite more recent federal circuit court cases as well, because they demonstrate the continued validity of the rule expressed in *Alderman* and the consistency with which the federal courts have adhered to it.

[10] *See also United States v. King*, 222 F3d 1280, 1285-86 (10th Cir 2000); *United States v. Ienco*, 182 F3d 517, 528 (7th Cir 1999); *United States v. Crosby*, 739 F2d 1542, 1549 (11th Cir 1984), *cert den sub nom Hirsch v. United States*, 469 US 1076 (1984).

discovered after the illegal search of the tires. In particular, the trial court suppressed: the statements from defendant, his girlfriend, and her mother to Gillespie in his conversation with them after he went to the front door of the residence; defendant's performance on the field sobriety tests; and the result of the Breathalyzer test that defendant took after being arrested. In suppressing that additional evidence, the trial court reasoned that the state failed to meet its burden under the statute. Specifically, the trial court observed:

> "The state cannot avoid the burden of proof by remaining silent regarding the facts surrounding the contact. The search of the tire is suppressed along with all subsequent statements made by the defendant at the scene and the result of the field sobriety tests."

The trial court appears to have concluded that *former* ORS 133.683 places the initial burden on the state to establish that the secondary evidence was not derived from a prior illegality.

In doing so, the trial court erred. *Former* ORS 133.683, as a codification of the federal "fruit of the poisonous tree" doctrine, places the initial burden on the defendant to establish a factual nexus between the secondary evidence and the prior police illegality. Although that nexus "is one of common sense to be considered under the facts and circumstances of the particular case," *see United States v. Houltin*, 566 F2d 1027, 1031 (5th Cir), *cert den* 439 US 826 (1978), the defendant, at a minimum, must go forward with specific evidence demonstrating that the secondary evidence was derived from the primary illegality. *See Alderman*, 394 US at 183 (noting that the defendant "must go forward with specific evidence demonstrating taint").[11] If the defendant does so, the burden then shifts to the state to establish "by a preponderance of the evidence that such evidence would have been discovered by law enforcement authorities irrespective of such search or seizure[.]" *Former* ORS 133.683. In other words, the defendant has the initial burden of establishing the requisite factual nexus between a primary illegality and

---

[11] *See also Kandik*, 633 F2d at 1335; *United States v. Cella*, 568 F2d 1266, 1284-85 (9th Cir 1977); *United States v. Crouch*, 528 F2d 625, 629 (7th Cir), *cert den* 429 US 900 (1976).

derivative evidence that the defendant believes should be suppressed in addition to the evidence that the illegality directly produces. If the defendant does so, the burden then shifts to the state to establish that discovery of the secondary evidence was inevitable.

As we observed at the outset, the record is silent as to what, specifically, occurred regarding Gillespie's contacts with defendant and the residents after he touched the tires. The record reveals only that the officer continued to the front door; that he talked to defendant, defendant's mother, and defendant's girlfriend; that he formed the belief that defendant had been driving while intoxicated; and that he administered field sobriety tests and, later, a Breathalyzer test. Defendant produced no evidence—specific or otherwise— that there was a factual nexus between the primary illegality (the touching of the tires) and the evidence obtained as a result of those later events. Defendant did not call any witnesses in the hearing on the motion to suppress. Although he cross-examined the state's only witness, Gillespie, defendant did not elicit any testimony from Gillespie as to whether or how he used the information that he gained from touching the tires. In particular, defendant did not ask Gillespie if the information played any part in his decision to contact the residents; whether Gillespie confronted the residents with the information about the tires, or so much as mentioned it to them; or whether Gillespie, in administering the field sobriety tests or administering the Breathalyzer tests, somehow used the information about the hot tires.[12] On this record, the facts do not provide a basis to conclude that there is even a simple "but for" connection between the tire search and the

---

[12] Defendant relies on the trial court's finding of fact that, "[a]fter feeling the tires, [Gillespie] felt very confident the GTO could have been the vehicle 'losing traction.'" The state maintains that the trial court's finding in that regard is not supported by the record, because the only evidence on the point was the officer's specific testimony that, *before touching the tires*, he felt very confident that the GTO could have been the vehicle losing traction. We need not resolve whether the trial court could make such a finding on this record. In all events, the finding at most establishes a "but for" causal link between touching the tires and going to the door to contact the residents. That is not enough. As importantly, the trial court did not grant the motion to suppress on that theory. Rather, as already described, the trial court specifically found the record to be silent as to any exploitation of the illegal search and ruled against the state after expressly assigning the burden of proof on the point to the state.

other investigatory activities pursued by Gillespie. More importantly, the record fails to establish any factual nexus sufficient to deem the subsequent statements and test performance to be derivative of the search of the tires, and therefore tainted and subject to suppression under *former* ORS 133.683. Thus, defendant did not meet his burden under the statute, and the trial court erred in suppressing the evidence.

The remaining question is whether the same result follows for purposes of our analysis under Article I, section 9, of the Oregon Constitution. The answer is that it does. Article I, section 9, also embodies a principle that requires the suppression of evidence that is derivative of a prior illegal search or seizure. *See generally State v. Rodriguez*, 317 Or 27, 38-42, 854 P2d 399 (1993). As is true of the federal analysis codified in *former* ORS 133.683, suppression of secondary evidence depends on the connection between the prior illegality and "the evidence sought to be suppressed." *Rodriguez*, 317 Or at 39. "But for" causation alone is not enough; rather, suppression depends on whether police obtained the secondary evidence through "exploitation" of the prior illegality. *Id.* at 39-40. Such "exploitation" occurs when the police take advantage of their unlawful conduct by, for example, "trading on evidence they" illegally obtained. *Id.* at 40.

In *State v. Daugaard*, 142 Or App 278, 282, 921 P2d 975 (1996), we expressly placed the burden of establishing exploitation on the defendant. In that case, the defendant consented to a search of his home after police allegedly arrested him without probable cause. Raising both state and federal constitutional grounds, the defendant argued that the evidence obtained in the search should be suppressed on an exploitation theory. We rejected his claims, reasoning that he had not established the requisite factual nexus between the prior illegality and the subsequently obtained evidence:

> "This case does not present the issue whether defendant's consent was voluntary—he makes no claim that it was not. The question, rather, is whether the consent was obtained by exploitation of a purportedly unlawful arrest. Where, as here, there is no claim that unlawful conduct affected the voluntariness of a defendant's consent in order to establish that the consent was invalid, a defendant must show that the police exploited their prior unlawful conduct to obtain

the consent. The Supreme Court has held that '[m]ere physical presence as a result of prior unlawful conduct does not constitute exploitation of that conduct.' *State v. Rodriguez,* 317 Or 27, 40, 854 P2d 399 (1993). The simple fact that, but for the arrest, the defendant would not have been in the presence of the police is not enough to render evidence discovered in a subsequent consent search inadmissible. *Id.* at 39-40. That is all defendant has shown here. Additionally, defendant's argument that the arrest violated his Fourth Amendment right to be free from unreasonable seizure lacks merit. Defendant fails to establish how his statements to the police were the product of his earlier seizure. *See Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963)."

*Id.*[13]

As was true in *Daugaard,* defendant does not challenge his statements as involuntary, nor does he assert that Gillespie did anything unlawful in conversing with the other residents of the home or in administering the field sobriety and Breathalyzer tests. He argues only that Gillespie exploited his unlawful search of the tires in obtaining that other evidence. But, as we concluded in analyzing the identical claim under *former* ORS 133.683, the record in that regard is largely silent. What record exists provides no basis for a conclusion that police "traded" on the information that the tires were hot or otherwise exploited that knowledge in obtaining the evidence acquired after the illegal search. Because the burden in that regard was defendant's, he was not entitled to suppression of that evidence on constitutional grounds.

To review, we conclude that the trial court correctly determined that the officer unlawfully searched the tires of defendant's car by touching them. The evidence obtained as a direct result of that illegality—*i.e.,* the testimony that the tires were hot—was properly suppressed. The trial court

---

[13] In several other cases, we implicitly have placed the burden of establishing exploitation on the defendant. *See, e.g., State v. Lee,* 174 Or App 119, 123-24, 23 P3d 999 (2001); *State v. Schwartz,* 173 Or App 301, 307-08, 21 P3d 1128 (2001); *State v. Peppard,* 172 Or App 311, 316, 18 P3d 488, *vacated on other grounds* 332 Or 630 (2001); *State v. Arabzadeh,* 162 Or App 423, 428, 986 P2d 736 (1999).

erred, however, in further suppressing all subsequently obtained evidence.

Order affirmed as to evidence obtained from search of tires; otherwise reversed and remanded for further proceedings.