Argued and submitted June 6, reversed and remanded October 2, 2002

# STATE OF OREGON,
*Respondent,*

*v.*

# ALBERT LAWRENCE EHRET,
*Appellant.*

# F04665; A111248

55 P3d 512

Jeffrey Steinborn, *pro hac vice*, argued the cause for appellant. With him on the brief was Law Offices of Jeffrey Steinborn.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong, Judge, and Warren, Senior Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Defendant appeals from a conviction for delivery of marijuana. ORS 475.992(2)(a). He contends that the trial court erred in denying his motion to suppress evidence that the arresting officers obtained as a result of questions that they posed to defendant during a traffic stop. We reverse.

At 1:39 a.m. on August 28, 1999, defendant was driving his vehicle at 83 miles per hour in a 65 mile per hour zone.[1] Officer Seber stopped defendant and approached the driver's side of defendant's vehicle. Defendant's son, William, was the vehicle's only other occupant. Seber asked defendant for his driver's license and proof of insurance. Defendant produced his driver's license and told the officer that his insurance had expired. Seber returned to his patrol car with the information and radioed his dispatcher. Seber received information that defendant's license was valid, that there were no outstanding warrants for his arrest, and that he was not on parole or probation. Seber sat in his patrol car and wrote out the speeding citation and the citation for driving without insurance. While he was preparing the citations, he also asked the dispatcher to run an additional check on defendant's criminal history.[2] The check revealed that defendant had past involvement with the police regarding narcotics. According to Seber, four to five minutes passed between the initial stop of defendant's car and the completion of the citations.

Seber left the patrol car with the completed citations. Instead of giving them to defendant, he put his citation book on the hood of his patrol car and again approached defendant's vehicle on the driver's side. The lights on his patrol car remained activated. He asked defendant to get out

---

[1] Defendant admitted to Officer Seber that he had been traveling at 80 miles per hour before he was stopped.

[2] Seber testified that, in a typical traffic stop, he checks only for driving status, parole status, and the existence of any arrest warrants. The record shows that, during the initial contact with defendant, Seber requested and received William's identification and also ran a check on William. That check showed initially that William was not on probation and that there were no warrants for his arrest. Later, after finding drugs, Seber ran another check that revealed that William had one prior drug-related matter.

of the car and stand between the two vehicles. Defendant complied with Seber's request. Seber asked defendant whether he had any drugs in his car. Defendant said "no." Seber told defendant that he was aware of his prior narcotics problems and asked him about them. Defendant said they involved marijuana. Seber asked for permission to search defendant and his car. Defendant consented only to a search of his person. Throughout the second interaction, defendant was sweating profusely, and Seber noticed that defendant had red, watery eyes. During the search of defendant's person, Seber found a "wad" of cash, totaling $1,514, in defendant's pants pocket. At 1:52 a.m., about 13 minutes after the initial stop, Seber called dispatch to report what he had found. Apparently after notifying dispatch about the cash, Seber told defendant that he thought $1,514 was a lot of cash to carry on one's person. He asked defendant if he had a bank account and whether he had any documentation showing that the money had come from a bank. He also told defendant that he believed that the money was related to illegal drugs and that a drug detection dog might be arriving soon at their location. In response, defendant explained that he was driving his son to college in Kentucky and that he needed the money for the long trip. He produced a bank receipt showing a withdrawal of part of the amount of cash. He continued to deny that there were any drugs in his car.

At 2:00 a.m., 21 minutes after the initial traffic stop, two other officers arrived on the scene and approached Seber as he was talking to defendant. One of the officers ordinarily would have had a drug detection dog with her. Seber and the other officers continued to talk to defendant between defendant's car and Seber's patrol car. Seber told the other officers about the amount of cash that he had found on defendant. Seber and the other officers asked defendant again if there were drugs in the vehicle, and the officers explained to defendant that in Oregon, possession of less than an ounce of marijuana was a violation and not a criminal offense. Seber also told defendant that he was also willing to "just search the immediate area of the driver's and passenger area and [if] no narcotics were located, they could be on their way." Defendant eventually admitted to one of the other officers, Nafziger, that there might be a "roach" in the car, that he

might have more than an ounce of marijuana in the car, and that he did not know how much marijuana, if any, that his son might have had with him in the car.

Seber approached William, who was still seated in the front passenger seat of defendant's car. He told William that possession of less than an ounce of marijuana was a violation of Oregon law, not a crime. He also told him that his father had said that there might be marijuana in the car and that there was the possibility of bringing a drug detection dog to the scene. According to Seber, William, without saying anything, reached into the crotch of his pants and produced a baggie that contained marijuana and white construction paper similar to what Seber knew was commonly used in the manufacture and distribution of LSD. William said the baggie contained marijuana and that it belonged to his father. Seber took the baggie from William and put it on the trunk of defendant's car. One of the other officers examined the baggie, asked defendant if it contained LSD, and defendant admitted that fact. The officers then searched the rest of defendant's car and found approximately $60,000 in cash and large amounts of marijuana, some designer drugs, and opium. Both defendant and William admitted ownership of certain contraband that was found.

Defendant was arrested and charged with two counts of possession of a controlled substance and one count of delivery of a controlled substance. He moved before trial to suppress the evidence obtained by the police after the citations were written,[3] arguing that Seber unlawfully extended the duration of the stop beyond what was necessary to issue the citations. The trial court denied the motion, ruling:

"1.  There was a valid traffic stop with 'suspicious' factors afterward—profuse sweating by driver and a very nervous driver;

"2.  When driver was asked if he could be searched, driver agreed and $1,500 cash was found on his person;

"3.  Driver's criminal history (CCH) showed a narcotics background;

---

[3] William was charged separately and made the initial motion to suppress, in which defendant joined.

"4. Driver[ ] admitted that there might be a 'roach' in the car and that his son (passenger) might have more marijuana;

"5. When the passenger was told about 'less than one ounce' and that the drug dog might come, the passenger pulled marijuana and LSD from the crotch of pants and handed these over to officer. The presence of LSD was confirmed.

"FINDINGS

"1. When the passenger pulled out the marijuana and LSD he did so 'voluntarily' before he was in custody.

"2. The drugs formed the basis of an 'automobile exception' to the Search Warrant requirement based on exigent circumstances.

"RULING

"The search and the obtaining of statements of the driver and the passenger were valid. The search, and its fruits, are not subject to suppression. Defendant's Motion to Suppress is denied."

Defendant was convicted of the delivery count, and the other two counts were dismissed. He appeals and reasserts his argument that "the trial court erred in denying [defendant's] Motion to Suppress because Trooper Seber and his fellow officers exceeded the constitutionally permissible scope of a traffic stop and then exploited each new development" in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.[4] We turn to defendant's state constitutional

---

[4] Defendant does not contend that the conduct of the police violated ORS 810.410. That statute provides in part that, during a traffic stop, an officer:

"(b) May stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation.

"(c) May make an inquiry into circumstances arising during the course of a detention and investigation under paragraph (b) of this subsection that give rise to a reasonable suspicion of criminal activity.

"(d) May make an inquiry to ensure the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

"(e) May request consent to search in relation to the circumstances referred to in paragraph (c) of this subsection or to search for items of evidence otherwise subject to search or seizure under ORS 133.535."

challenge first. *State v. Cookman*, 324 Or 19, 25, 920 P2d 1086 (1996).

Article I, section 9, provides, "No law shall violate the right of the people to be secure in their persons, houses, papers and effects, against unreasonable search, or seizure[.]" Under Article I, section 9, the police cannot continue to lawfully detain a defendant after a legal stop has ended without reasonable suspicion that he or she has engaged in some criminal activity. *State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998). Reasonable suspicion as a basis for a stop or a detention requires that the officer subjectively believes that the person has committed a crime and that the belief is objectively reasonable, in light of the totality of the circumstances. ORS 131.605(5); *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997).

On the other hand, a "mere conversation" between an officer and an occupant, occurring during or after a traffic stop, does not amount to a seizure of the person, so long as the police conduct does not have the effect of accomplishing a restraint on liberty that goes beyond that inherent in the traffic stop itself. In *State v. Amaya*, 176 Or App 35, 44, 29 P3d 1177 (2001), *rev allowed*, 334 Or 288 (2002), we explained,

> "[Q]uestioning during an otherwise valid traffic stop that does not have such a detaining effect does not require reasonable suspicion. That is because, under *Toevs*, it is detention that triggers Article I, section 9, not the mere fact that the officer is asking questions. Said another way, only when the questioning rises to the level of a seizure is the constitution implicated. Not all questioning will rise to that level, particularly when it takes place during a lawful stop and does not have the effect of extending its duration."

(Emphasis omitted.)

Defendant argues that the lawfulness of his detention ended when Seber completed writing the citations and that any further detention was an illegal restraint of his liberty. It follows from the above facts, according to defendant, that Seber exploited the continuing detention until he was

able to elicit from defendant the admissions that led to the confrontation with William and the seizure of the baggie containing marijuana and LSD. Consequently, defendant argues, all evidence that was derived from the illegal detention must be suppressed under Article I, section 9. In response, the state argues that the stop was not extended beyond its legal limits. It reasons that defendant voluntarily consented to questioning after Seber returned from his patrol car and that what occurred thereafter constituted a mere citizen-police encounter. It concludes that the subsequent questioning that led to defendant's admissions and the discovery of drugs in his car did not rise to the level of a stop or restraint of liberty within the meaning of Article I, section 9.

We conclude that the facts clearly establish that the traffic stop was ongoing at the time that Seber returned to defendant's car. That is to say, this case is not like those cases in which a conversation occurred between a citizen and a police officer after a traffic stop had ended. *See, e.g., State v. Peppard,* 172 Or App 311, 18 P3d 488, *vac'd,* 332 Or 630, 34 P3d 168 (2001); *State v. Arabzadeh,* 162 Or App 423, 986 P2d 736 (1999). Here, the lights of the patrol car were still on, indicating that defendant's detention pursuant to the traffic stop was ongoing. Further, Seber had not delivered the citations to defendant, which could have indicated that the stop was over. Rather, he put them on the hood of his patrol car. The record also supports the inference that Seber had retained defendant's driver's license at the time he approached defendant's car for the second time. Also, Seber did not tell defendant that he was free to leave, and defendant would not have reasonably perceived that he was free to leave with the lights of the patrol car still flashing.[5] While ORS 810.410 authorized Seber to ask questions during the stop relating to the investigation of the traffic violation, ORS 810.410(3)(b), and about weapons or other issues related to officer safety, ORS 810.410(3)(d), Seber had no authority, statutory or constitutional, to extend the duration of the stop

---

[5] Seber was asked by defense counsel at the suppression hearing, "You're not telling us that [defendant] was free to leave before you'd given the citation?" Seber replied, "The only-the only thing I would've * * * if he said, 'I'm leaving,' I'd've had to say, 'hey, wait a second, let me grab the citation, there you go, see ya.' "

by compelling defendant to get out of the car in the absence of a reasonable suspicion of criminal activity.[6]

■     The next question is whether Seber had a reasonable suspicion of criminal activity when he detained defendant further.

> "In making this * * * determination, we look to the objective facts known to the officer at the time of the stop. *State v. Valdez*, 277 Or 621, 561 P2d 1006 (1977). * * * [T]he significance of any of the facts may be enhanced by the officer's special knowledge of the way certain crimes, such as those involving narcotics, are committed or of the criminal history of the particular person."

*State v. Chambers*, 69 Or App 681, 685-86, 687 P2d 805 (1984). At the time, Seber knew that defendant had been speeding, that he did not have valid insurance, and that he had "several entries"[7] on his record of criminal history for narcotics involvement.[8] We conclude that those facts alone are insufficient to establish an objectively reasonable suspicion that, at the time of the stop, defendant was in possession of drugs. The fact that defendant had past involvement with drugs does not give rise to a reasonable suspicion that he possessed drugs at the time of the traffic stop, and his driving conduct or status has no apparent relationship to that issue on those facts.

Alternatively, the state argues that the above facts could give rise to a reasonable suspicion that defendant had committed the crime of driving under the influence of intoxicants. In order to support such a suspicion, however, there must be some fact that would indicate that defendant was perceptibly impaired in his ability to operate a motor vehicle

---

[6] There are no indications in the record that Seber was concerned about his safety, and the state does not make that argument.

[7] Seber did not know whether the entries were for arrests or convictions or contained other kinds of police information.

[8] The trial court found that the "suspicious factors" that Seber saw *after* defendant left the car formed the basis for a reasonable suspicion of ongoing criminal activity. However, those findings address the period of time after which the stop became unlawfully extended. The record shows that Seber observed defendant acting extremely nervous and sweating profusely, and that his eyes were bloodshot and watery, *after* he asked him to get out of the car and began the questioning.

as the result of the ingestion of controlled substances. ORS 813.010(1); *State v. Wright*, 94 Or App 468, 470-71, 765 P2d 1251 (1988), *rev den*, 307 Or 514 (1989). Seber's observations that defendant had red, watery eyes and was sweating profusely were made after he had defendant get out of the car. Moreover, reasonable suspicion to continue the stop for purposes of a criminal investigation requires a subjective suspicion that a crime has been or is being committed. *Belt*, 325 Or at 11. Importantly, Seber never testified that he believed that defendant was driving while impaired or that defendant was in fact under the influence of narcotics at the time.[9] Nothing in the record would permit the inference that Seber subjectively believed that defendant had been driving while under the influence. We conclude that Seber did not have a reasonable suspicion of criminal activity that would have justified the continuation of the detention of defendant.

■■ We turn to the state's argument that, notwithstanding Officer Seber's lack of justification for extending the duration of the stop, defendant acted voluntarily when he got out of his car and that his will was never overborne by the officers' questions after the police had him stand between his car and Seber's car, thereby demonstrating that he did not feel compelled to accede to the Officer's request. There is some evidence to support the state's argument. For instance, defendant initially consented only to a search of his person and refused to consent to a search of the car. However, the voluntariness, or lack thereof, of defendant's compliance with Seber's request is not necessarily dispositive of defendant's motion. Apart from whether evidence is derived from voluntary consensual conduct, Article I, section 9, prohibits the police from trading on, or "exploiting," a prior illegality in order to gain consent. *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994). "Exploitation occurs when police take advantage of the circumstances of their unlawful conduct[.]" *State v. Rodriguez*, 317 Or 27, 40, 854 P2d 339 (1993); *see also State v. Williamson*, 307 Or 621, 772 P2d 404 (1989) (the police traded on an observation made during an unlawful roadblock and a threat to obtain a search warrant to gain the

---

[9] Instead, Seber testified that he believed that defendant's physical characteristics (sweating and nervousness) were a result of defendant's apprehension from talking with him.

defendant's consent to search his vehicle). Although the police through their questioning did not obtain defendant's consent to search his car, they did obtain admissions from him that led them to confront William. The issue becomes whether those admissions are the product of an exploitation of a prior illegality, and therefore subject to suppression even if made voluntarily. *See, e.g., State v. Hall*, 183 Or App 48, 50 P3d 1258 (2002).

Our analysis of that issue is informed by our holding in *State v. Cardell*, 180 Or App 104, 41 P3d 1111 (2002). In *Cardell*, the police received a report that a car was racing on public streets. An officer went to the area of the report, and, while on his way, he received information that the car in question was a blue GTO. Approximately three to five minutes later, he saw a car matching that description parked in the driveway of a residence. He walked up the driveway and, on his way past the car, felt its tires to discern whether they were hot. He then went to the door of the residence, questioned the occupants, including the defendant, and eventually formed the suspicion that the defendant was intoxicated and had operated the vehicle that was in the driveway. After administering field sobriety tests, the officer arrested the defendant and charged him with driving under the influence of intoxicants.

The trial court suppressed all observations of the defendant and his statements and admissions on the ground that the officer had exploited an "illegal" search, *i.e.*, the warrantless touching of the tires of the car. The state argued to the contrary on appeal, but we agreed that the touching constituted a search. The remaining question was whether the evidence obtained after the officer went to the door should have been suppressed on the ground that it was the product of an exploitation of the unlawful search. We observed that there "was [no evidence of] a factual nexus between the primary illegality * * * and the evidence obtained as a result of those later events." *Cardell*, 180 Or App at 115. We pointed to the fact that the officer did not refer to the fact that the tires were hot when he talked with the defendant. Our holding in *Cardell* is an example of where the police did not exploit prior illegality.

In contrast to *Cardell*, the facts in *State v. Martin*, 124 Or App 459, 863 P2d 1276 (1993), provide an illustration of an exploitation of a prior illegality. In *Martin*, an officer arrested the defendant and then illegally opened a small tin that she found in his car. In the tin, she found controlled substances. That finding prompted her to ask the defendant whether he had *"more* drugs" in a paper bag that she had also found in his car. The defendant admitted that the bag contained drugs, which led the officer to ask for and obtain consent to search the bag. The bag contained additional contraband. In holding that the contents of the paper bag should have been suppressed by the trial court, we said:

> "There is a direct connection between asking [whether the bag contained *more* drugs] and the fact that the officer had illegally discovered methamphetamine in the earlier search. We conclude that the methamphetamine and scales discovered in the bag must be suppressed because the police obtained them by trading on evidence that they had only as a result of the illegal search incident to arrest."

*Martin*, 124 Or App at 467. In *Martin*, unlike in *Cardell*, the officer took advantage of the prior illegality by confronting the defendant with the information that had been obtained as a result of the unlawful search.

The facts in this case are more like the facts in *Martin* than in *Cardell*. Here, Seber obtained information during the unlawful detention that he had not obtained during the lawful traffic stop (that defendant had red, watery eyes, that he was nervous and sweating profusely, and that he was carrying a large amount of cash). That information, taken together with the knowledge of defendant's prior involvement with drugs, prompted Seber to question defendant further about whether he was in possession of drugs. Seber told defendant that he did not believe his explanation about the money and that he thought the cash was drug money, and Seber repeatedly asked defendant for consent to search his car. Unlike in *Cardell*, where the officer made no reference to the information learned during the illegal search, Seber took advantage of the information he obtained during the illegal detention that began when he asked defendant to leave the car. Seber used the information he obtained and questioned defendant until he made admissions that led

the police to confront William. Assuming that William's production of the baggie was voluntary, that conduct was also the product of the unlawful detention.[10] *See, e.g., State v. Somfleth*, 168 Or App 414, 427-28, 8 P3d 221 (2000). Because all of the evidence seized was obtained by the exploitation of the unlawful detention, the trial court should have granted defendant's motion to suppress under Article I, section 9.

Reversed and remanded.

[10] While William may have voluntarily produced the baggie of drugs as a result of defendant's unlawful detention, that does not mean that the police had an independent source for the contraband discovered in the car to be used against defendant. The issue is whether the personal rights of defendant or William against unreasonable search and seizure where separately violated. If the police had obtained William's consent to search without relying on defendant's illegally obtained statement, William's consent would have operated as an independent source of information justifying an invasion of defendant's privacy and possessory interests. Here, because the police relied on statements made by defendant as a result of the unlawful detention to secure William's consent, the causal connection between the illegality and the seizure remains. William's voluntary intervening act does not vitiate the violation of defendant's rights because that act occurred as a result of the prior illegality.