Argued and submitted November 4, 2003, reversed and remanded
January 28, 2004

In the Matter of
Sean Christopher O'Farrell,
a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF WASHINGTON COUNTY,
*Appellant,*

*v.*

SEAN CHRISTOPHER O'FARRELL,
*Respondent.*

J000624; A116174

83 P3d 931

628

Rolf C. Moan, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Susan D. Isaacs argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

In this juvenile delinquency case, youth made inculpatory statements during an interview with police detectives while he was under investigation for conduct that, if committed by an adult, would amount to aggravated animal abuse, ORS 167.322(1)(a). At a subsequent hearing, the trial court granted youth's motion to suppress the statements because they resulted from the detectives' exploitation of unlawful questioning and because the detectives overbore youth's will. The state appeals. ORS 419A.208(1)(c). We review factual findings *de novo* and legal issues for errors of law. ORS 419A.200(6)(b); *State ex rel Juv. Dept. v. Gallegos*, 150 Or App 344, 347, 945 P2d 656 (1997). We reverse.

The present case involves the alleged mutilation and killing of a cat. Some time before the interview during which the inculpatory statements regarding that event occurred, youth was charged with abuse of a dog in an unrelated case. He had been charged with that conduct and was represented by counsel on that charge. At the time of the interview at issue in this case, he was housed in a private facility[1] awaiting disposition in the dog case. He had not been charged with any conduct involving the cat incident, and he had no legal representation regarding it. He was 17 years old.

The interview was conducted by Detectives Trapp and Stratford in an attic office at the private facility where youth was housed. The detectives were aware of the animal abuse charges pending against youth in the dog case. Both detectives wore plain clothes and their weapons were concealed. Trapp introduced herself, and both officers showed their badges to youth. Trapp then began to read him his *Miranda* rights from a form. After hearing the first right, youth was able to recite the remaining rights from memory. Trapp then reviewed the form with youth, and youth paraphrased his understanding of each right for the detectives in his own words. He then signed the advice-of-rights form.

---

[1] Youth was at a facility identified in the briefs only as "Reece-Lamb." Nothing in the record illuminates, nor have we been asked to judicially notice, the function of the center or whether youth was free to leave it.

Early in the interview, Trapp told youth that she knew that he had harmed the cat. Youth denied it. Suspecting that youth might be the victim of child abuse, she told him that "young people take things out on * * * other things or other people when they have been abused[.]" She said that she knew about the cat incident *and the dog incident*; she then asked whether youth had been the victim of abuse, whether he needed "some * * * help with his pain," and "if that abuse was the reason he took things out on animals?" Youth responded by talking about the incident with the dog, but he continued to deny that he had harmed the cat.

Trapp then told youth that she had conducted an investigation of the cat incident. She told him that fingerprints could be lifted from the scene and that a veterinarian was going to examine the evidence left there. She began, in her words, "probing for some specific reasons why [youth] might have hurt the cat," asking if youth was angry while he killed it, and wanting specific information about how he performed the act. During this part of the questioning, youth independently reintroduced the issue of fingerprints and appeared "confused." Trapp told him that "fingerprints are like DNA" and "would be unique only to him."

Trapp then asked whether youth was sorry about what he did. Youth said he was, but he stated that he didn't remember killing the cat. After more questioning, he ultimately told Trapp that he had stabbed the cat to death. Thereafter, Trapp showed him pictures of the cat and a picture of a wooded area behind the home where youth had been living at the time of the incident. Youth circled an area on the landscape picture and told the detectives that was where he had left the cat. Shortly thereafter, he was asked whether he wanted to make a tape-recorded admission. The response is unclear from the record, but it appears that in lieu of making a tape, Trapp wrote out youth's statements. Youth read them over and made some minor changes before signing them. Some 90 minutes had elapsed since the interview began.

After charges were filed in connection with the cat case, the youth moved to suppress all written and oral statements made to Trapp and Stratford. The trial court granted the motion as to all statements made after Trapp mentioned

the dog case. In its opinion letter, the court found that, although youth had voluntarily waived his *Miranda* rights, the detectives exploited unlawful questioning about the dog case in order to obtain youth's statements about the cat case. The court also found that statements made by youth after mention of the dog case were involuntary because "mention of the dog case overrode [youth's] will to not discuss the cat case." The state's motion for reconsideration was denied, and this appeal ensued.

The state assigns error to the suppression of youth's admissions regarding the cat case. The parties agree that the trial court correctly ruled that, because youth was represented by counsel regarding the dog case at the time of the interview, in discussing that case the detectives violated youth's right to counsel under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. *State v. Sparklin*, 296 Or 85, 93, 672 P2d 1182 (1983); *McNeil v. Wisconsin*, 501 US 171, 179, 111 S Ct 2204, 115 L Ed 2d 158 (1991). They also agree that the detectives could lawfully question youth concerning the cat case because he had not been charged with that conduct and it was not inextricably intertwined with the dog case. *Sparklin*, 296 Or at 95; *State v. Hill*, 142 Or App 189, 195-96, 921 P2d 969 (1996), *rev den*, 327 Or 521 (1998); *McNeil*, 501 US at 175; *Texas v. Cobb*, 532 US 162, 121 S Ct 1335, 149 L Ed 2d 321 (2001).[2] Finally, the parties agree that youth voluntarily waived his *Miranda* rights. The parties frame the issues before this court as (1) whether the detectives exploited the unlawful discussion of the dog case to obtain youth's admissions in the cat case, and (2) whether the statements made by youth after the detectives mentioned the dog case were voluntary. They agree that if exploitation of illegality occurred or if the statements were involuntary, they must be suppressed.

We begin with the exploitation question. The trial court agreed with youth that any statements resulting from

---

[2] Defendant does not argue, and we find no evidence in the record, that the detectives were "on notice that the suspect's attorney reasonably would regard protection of the suspect's rights in the matter under investigation to fall within his professional responsibility." *Sparklin*, 296 Or at 99 (Linde, J., concurring).

exploitation of the detectives' conversation with youth insofar as it dealt with the dog case must be suppressed; those parts of the interview violated youth's right to counsel, and, under the "fruit of the poisonous tree" doctrine, all evidence that was "come at by exploitation of that illegality" is tainted. *Wong Sun v. United States*, 371 US 471, 488, 83 S Ct 407, 9 L Ed 2d 441 (1963) (internal quotation marks omitted); *accord State v. Rodriguez*, 317 Or 27, 40, 854 P2d 399 (1993). The trial court found as fact that youth established that he "would not have made statements on the cat case without the police-initiated discussion of the dog case." Accordingly, the court suppressed all statements youth "made after the detectives mentioned the dog case." The state renews the arguments it made at the suppression hearing: that youth did not adduce evidence demonstrating a causal connection between the discussion of the dog case and youth's statements regarding the cat and, in any event, even if such a connection existed, the state demonstrated that other topics of discussion, in particular the discussion of circumstantial evidence linking youth with the crime, independently would have elicited the confession.

■ On *de novo* review, we agree with the state's first proposition, and it is dispositive: youth did not establish the necessary connection between the unlawful questioning about the dog and his statements about the cat. Exploitation occurs when police take advantage of their unlawful conduct, for example by using information that the conduct produced, *e.g., State v. Schwartz*, 173 Or App 301, 307-08, 21 P3d 1128, *rev den*, 333 Or 162 (2001), or by trading on information unlawfully obtained in order to leverage consent, waiver, or some concession from the accused, *e.g, Rodriguez*, 317 Or at 40-41. Youth had the initial burden of establishing exploitation, that is, of showing a " 'factual nexus' between the unlawful police conduct and the challenged evidence * * *. [I]f a defendant makes that initial showing, then the burden of proof shifts to the government to show that the unlawful conduct has not tainted the evidence[.]" *State v. Johnson*, 335 Or 511, 520, 73 P3d 282 (2003); *State v. Cardell*, 180 Or App 104, 117, 41 P3d 1111 (2002). Although establishing a causal "but-for" connection between the unlawful conduct and the evidence is not sufficient to establish the requisite nexus, it is

nonetheless necessary; "there will have to be, at the very least, a causal connection between the unlawful police conduct and the evidence uncovered during the subsequent consent search." *Rodriguez*, 317 Or at 39. Further, the fact that the violation occurs before the statement does not imply that the violation caused the statement; a defendant must establish a more logical connection. The determination whether a defendant has met the burden of establishing a nexus is "one of common sense to be considered under the facts and circumstances of the particular case." *State v. Doyle*, 186 Or App 504, 512, 63 P3d 1253, *rev den*, 335 Or 655 (2003). In the present case, youth has not done so.

■    Youth does not argue that the detectives obtained information from their unlawful reference to the dog incident or "traded on" that portion of the interview in order to elicit statements. *Rodriguez*, 317 Or at 41. Those causation arguments make sense in the more typical situation in which unlawful searches or seizures lead to either the discovery of physical evidence or consent. Rather, youth's argument focuses on Trapp's inclusion of the dog incident in her general statements suggesting that youth's animal abuse might be the result of his own prior victimization or a symptom of his pain that she might be able to help. According to youth, the inclusion of the dog incident in that discussion created an atmosphere or situation likely to induce youth to make inculpatory statements.

We are not persuaded. No witness testified directly about any cause-and-effect relationship between mention of the dog incident and youth's confession regarding the cat. Youth himself did not testify at all. His expert psychological witness, Dr. Miller, testified in some detail about youth's personality and intelligence, but he did not discuss how those traits might bear on the likelihood that youth would react to mention of the dog incident by making statements about the cat incident. Thus, the only evidence is inferential. In particular, we can deduce only two inferences. The first is that, because the confession regarding the cat occurred *after* the mention of the dog, it occurred *because of* the mention of the dog. Such an inference is prohibited by the laws of logic (the *post hoc ergo propter hoc* fallacy) as well as case law. *Id.*; *State v. Chambers*, 147 Or App 626, 631, 938 P2d 793 (1997), *rev*

*den*, 327 Or 82 (1998). The second inference is that a 17-year-old with low intelligence, a propensity to hallucinate and become confused, and a predisposition to provide answers he thought would meet his questioners' expectations, is also, because of those traits, likely to react to mention of two incidents of animal abuse with a confession but not likely to react to mention of only one incident that way. Youth offers no argument why such an inference is valid, and we can discern none. Even if it were valid, it would not be as strong as the inference that youth confessed to the cat activity because Trapp told him that physical evidence would inculpate him. Youth, then, did not meet his burden of establishing a factual and logical nexus between the violation of his right to counsel in the dog case and his statements regarding his involvement in the cat case.

■ ■    Still, youth's statements must be suppressed if, as the trial court also found, they were involuntary. The state has the burden of proving voluntariness by a preponderance of the evidence. *Rodriguez*, 317 Or at 38. A statement is voluntary if, under the totality of the circumstances, the "defendant's will was not overborne and his capacity for self-determination was not critically impaired." *State v. Vu*, 307 Or 419, 424, 770 P2d 577 (1989).

■    The trial court found that the detectives had not made "any threats, intimidation, or promises nor did [it] find any mention of fingerprints sufficiently false or misleading so as to negate voluntariness" but that, nonetheless, youth's will was overborne when the detectives mentioned the dog case; youth's "limited intellectual abilities" rendered youth unable to resist the detectives' "manipulation." That finding, however, occurred before our opinion in *State ex rel Juv. Dept. v. Deford*, 177 Or App 555, 34 P3d 673 (2001), where we clarified the relationship, for purposes of determining voluntariness, between a suspect's personal characteristics and police conduct. We held that, although determining whether a statement is voluntary can include consideration of a suspect's age, education, and intelligence, those personal characteristics and circumstances alone cannot render statements involuntary; "such circumstances are relevant only if police, in fact, exert coercion." *Id.* at 572; *accord Colorado v. Connelly*, 479 US 157, 164, 107 S Ct 515, 93 L Ed 2d 473

(1986) (individual characteristics of a person questioned by police cannot, without more, "ever dispose of the inquiry into constitutional voluntariness"). Police coercion or other misconduct, in other words, is a necessary predicate to a finding of involuntariness. Therefore, we must first determine whether Trapp and Stratford exerted coercion during their interview with youth.

In support of his claim that his statements were involuntary, youth relies primarily on the testimony of Miller. Miller testified that while he interviewed youth, youth would become quiet and stare off into space or would appear to suffer from hallucinations and make delusional and bizarre statements. Based on those observations and the results of several standardized psychological and intelligence tests, Miller concluded that youth is borderline mentally retarded and suffers from a psychotic disorder that interferes with social interaction and causes him to become delusional. Miller testified that youth's admissions were simply impulsive responses to highly suggestive cues given by Trapp and that the interview caused so much stress that youth falsely admitted to killing that cat in order to end the conversation. This testimony, however, does not tend to show that youth's confession was anything more than the product of his "internal pressures or personal cognitive limitations." *Deford*, 177 Or App at 570. Those pressures and limitations, without evidence of police coercion, cannot support a finding of involuntariness. *Id.*

Coercion typically consists of either threats or promises. *See Vu*, 307 Or at 424-25. We agree with the trial court's finding that the detectives did not make any threats or promises to youth. We also agree that youth was not subjected to intimidating behavior. Nothing about the interview location, in itself, was threatening. The detectives were not in uniform and did not display weapons. Trapp chose to interview youth using a technique designed to be nonintimidating; the detectives did not bully youth or demand certain answers. Rather, Trapp indicated that she wanted youth to talk about his own past so that the detectives could help him. Youth did not ask for breaks or water. He was allowed to use the restroom but did not choose to do so. He was never put into restraints. Significantly, as he concedes, he received *Miranda* warnings and

understood them. *See State v. Smith*, 301 Or 681, 701, 725 P2d 894 (1986) ("where the state has given *Miranda*-type warnings and avoided any form of compulsion, the state has met its burden" of proving voluntariness).

Without evidence that the detectives exerted coercion during the interview with youth, we are unable to agree with the trial court's determination that youth's statements were made involuntarily. Accordingly, because youth's admissions about the cat case did not result from exploitation of the detectives' unlawful discussion of the dog case and were voluntary, they are admissible, and the court erred in suppressing them.

Reversed and remanded.