Argued and submitted March 23, reversed and remanded August 10, 2011, petition for review denied February 16, 2012 (351 Or 586)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DANIEL JAY POTTER,
*Defendant-Appellant.*

Multnomah County Circuit Court
080331177, 080431933;
A142227 (Control), A142243

260 P3d 815

Kenneth A. Kreuscher, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Shannon Terry Reel, Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Stacey RJ Guise, Senior Assistant Attorney General.

Before Brewer, Chief Judge, and Edmonds, Senior Judge.

BREWER, C. J.

## BREWER, C. J.

In these cases, which were consolidated for trial and appeal, defendant was convicted of numerous counts of identity theft. ORS 165.800. In Case Number 080331177 ("the APF case"), defendant was found guilty of one count of identity theft; in Case Number 080431933 ("the BTS case"), defendant was found guilty of six counts of identity theft.[1] On appeal, he argues that the trial court should have suppressed evidence of certain statements he made because they were the result of police interrogation conducted in violation of his right to counsel under Article I, section 11, of the Oregon Constitution. For the reasons explained below, we agree, and therefore reverse and remand.

We review the denial of a motion to suppress for legal error and defer to the trial court's findings of historical fact if there is sufficient evidence to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). The pertinent underlying facts are not in dispute. On March 11, 2008, defendant's brother, Edward Lane, attempted to cash a forged check drawn on the account of BTS Container Services (BTS). Lane became nervous and fled the bank where he was attempting to cash the check, leaving the check, as well as his identification, behind.

On March 12, 2008, defendant attempted to cash a forged check drawn on the account of Atlantic & Pacific Freightways (APF). The teller believed that the check was fraudulent and called the police, who arrived and arrested defendant. Shortly thereafter, one of defendant's accomplices arrived at the same bank and attempted to cash another fraudulent APF check; he also was arrested.

Detective Glass was assigned to investigate the crimes involving the fraudulent APF checks. Defendant was arraigned in the APF case on March 13, 2008, and counsel was appointed for him. He remained in custody on the APF case until March 27. Meanwhile, on March 26, Lane returned

---

[1] Before trial, the state moved to consolidate the two cases, asserting that the cases "are either of the same or similar character, are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." The trial court granted the motion; that decision is not at issue on appeal.

to the first bank where he had attempted to cash the BTS check on March 11. Lane was arrested at the scene, and Detective Malanaphy questioned Lane while he was in custody. Lane told Malanaphy that defendant had created the fraudulent BTS check, using as a template a legitimate check that defendant had received from BTS. When Malanaphy went to defendant's home to arrest him, defendant's wife told him that defendant already was in custody. Malanaphy talked to defendant's wife "about defendant's activities," and she gave him a computer hard drive that had been hidden in a heating vent in the house.

Malanaphy learned from police records about the pending charges in the APF case, and he contacted Detective Glass, who was stationed at a different precinct. Glass told Malanaphy that she had arrested defendant for identity theft, based on his creation of fraudulent APF checks using a computer. Glass's investigation had uncovered information concerning two additional counterfeit BTS checks, so she provided that information to Malanaphy for purposes of his investigation.

On March 27, Malanaphy and Glass went together to defendant's house and questioned defendant's wife about some of his accomplices. They found out that defendant was scheduled to be released from jail that day. Malanaphy returned alone to defendant's house again on March 28 and told defendant that he would like to talk to him. Before questioning defendant, Malanaphy gave him *Miranda* warnings. Malanaphy's specific questions related to the fraudulent BTS checks. Malanaphy did, however, encourage defendant to reveal the names of his accomplices in an effort to solve other possible crimes. Defendant acknowledged having used a computer to create fraudulent checks, and he also admitted giving one of those checks to Lane.

Before trial, defendant moved pursuant to Article I, section 11, to suppress the statements that he had made to Malanaphy on March 28, arguing that, because he had invoked his right to counsel in the APF case, Malanaphy was required to contact defendant's attorney before attempting to interview him on a factually related matter. The prosecutor replied that, because the facts of the APF case and the BTS

case were not "inextricably intertwined," and Malanaphy had only questioned defendant about the BTS case, the evidence need not be suppressed. The court denied defendant's motion, stating "that they're not inextricably intertwined."

After a bench trial, the court convicted defendant of identity theft in both cases. On appeal, defendant reiterates his Article I, section 11, argument, to which the state responds that the trial court correctly denied the motion based on its findings that the facts underlying the two cases were not "inextricably intertwined." We conclude that the state has misunderstood one of our prior cases and that the proper inquiry is not whether the cases are "inextricably intertwined," but, rather, whether the cases are "factually unrelated."

In *State v. Sparklin*, 296 Or 85, 672 P2d 1182 (1983), the defendant was arrested in Eugene for using a stolen credit card belonging to Mansell. After the defendant had been arraigned and provided with appointed counsel, Portland detectives interrogated him about an assault and robbery during which Mansell's credit cards were stolen. The detectives also questioned the defendant on "a *factually unrelated* murder and robbery in Portland of a man named Davidson for which defendant was tried and convicted in this case." 296 Or at 87 (emphasis added). The defendant asserted that the information gleaned during the interview concerning the Davidson murder should have been suppressed.

The court began with the basic proposition that Article I, section 11, provides that, "once a person is charged with a crime he or she is entitled to the benefit of an attorney's presence, advice and expertise in any situation where the state may glean involuntary and incriminating evidence or statements for use in the prosecution of its case against defendant." *Id.* at 93. Thus, after a person has been charged and afforded counsel, "there can be no interrogation of a defendant concerning *the events surrounding the crime charged*" without notification of the attorney. *Id.* (emphasis added).

After discussing the origins of the Article I, section 11, right, the court stated:

"It is the fairness of the 'criminal prosecution' which counsel's presence helps to ensure. For this reason the [A]rticle I, section 11 right to an attorney is specific to the criminal episode in which the accused is charged. The prohibitions placed on the state's contact with a represented defendant do not extend to the investigation of *factually unrelated criminal episodes*."

*Id.* at 95 (emphasis added; internal quotation marks omitted; footnote omitted).

Before we turn to a discussion of what "factually unrelated" means, we must briefly pause to examine the court's use of the term "criminal episode" in the above-quoted material. "Criminal episode" is a term that, at this point in time, has been used in so many diverse statutory and constitutional contexts within the criminal law that its precise meaning in any given context, much less its origins, is not always clear. Suffice it to say that, at the time the court wrote *Sparklin*, the court had most often been grappling with the phrase in the context of statutory and constitutional former jeopardy. *See, e.g.*, *State v. Hamilton*, 291 Or 283, 291, 634 P2d 208 (1981) (discussing statutory former jeopardy and the definition of "criminal episode" contained in ORS 131.505(4)); *State v. Brown*, 262 Or 442, 457-58, 497 P2d 1191 (1972) (noting not-yet-enacted definition of "criminal episode" later enacted as ORS 131.505(4), and concluding that, for purposes of former jeopardy provisions of Article I, section 12, multiple prosecutions are barred if "(1) the charges arise out of the same act or transaction, and (2) the charges could have been tried in the same court, and (3) the prosecutor knew or reasonably should have known of the facts relevant to the second charge at the time of the original prosecution"). But as the court explained in a different context, the "criminal episode" and "same act or transaction" issue had arisen in numerous interrelated areas—not merely with regard to how many prosecutions may be brought, but also involving how many offenses may be separately charged and, if separately charged, whether verdicts must merge or sentences must be imposed concurrently. *State v. Cloutier*, 286 Or 579, 584-85, 596 P2d 1278 (1979).[2]

---

[2] We note in passing that *none* of the court's cases touching on "criminal episode," "same act or transaction," or "factually unrelated" makes use of the phrase "inextricably intertwined."

With that background in mind, we return to the court's statement in *Sparklin*. As an initial matter, we note that we cannot simply take at face value the court's statement that the Article I, section 11, right "is specific to the criminal episode in which the accused is charged" to mean that the prosecutor's initial decision to bring the charges in two separate indictments (and, for example, later move to consolidate them for trial as the prosecutor did here) somehow defines or limits the scope of the Article I, section 11, right. *Sparklin*, 296 Or at 85. Thus, the focus must be on whether the charges, regardless of how the case was initiated, pertain to *"factually unrelated* criminal episodes." *Id.* (emphasis added).

In *Sparklin*, the court examined persuasive authority from other states that had concluded, in general, that questioning about "factually related" crimes was impermissible, but questioning about "unrelated crimes" was permissible. *See, e.g., id.* at 96 (citing *State v. Derrico*, 181 Conn 151, 168, 434 A2d 356, 366 (1980) (questioning was permissible if the other matter "was genuinely unrelated and neither a sham nor a pretext for investigation" of the charged crimes); *People v. Boyd*, 86 Cal App 3d 54, 60, 150 Cal Rptr 34 (1978) (rule applies to charged crimes as well as to crimes that are related to those charged). Ultimately, the court concluded that,

> "[b]ecause defendant was represented by an attorney for the crimes against Steven Mansell, interrogation on this subject was improper and no waiver of this right can be given effect. However, with regard to the unrelated Davidson case, defendant's waiver is valid."

*Sparklin*, 296 Or at 98.[3]

---

[3] We note, somewhat ironically given the facts of the present case, that Justice Linde pointed out the following in a concurrence in *Sparklin*:

> "What makes the ['factually unrelated'] distinction appear plausible in this case is that a defendant jailed in one city on the charge on which he had legal counsel confessed to an apparently unrelated crime in another city, in response to questions by officers from that city. *But the distinction is likely to prove difficult to administer when* * * * *officers from the same or a closely associated jurisdiction question a suspect about activities related in time or place,* * * * *or by the repetition of similar unlawful acts.*"

*Id.* at 99 (Linde, J., concurring) (emphasis added).

We have decided several pertinent cases in the wake of *Sparklin*. In *State v. Staunton*, 79 Or App 332, 334, 718 P2d 1379 (1986), the defendant initially was arrested for, and charged with, driving while intoxicated and possession of a stolen car. An officer who was investigating those crimes determined that the car had been stolen from Elling in a burglary, and he found evidence of other potential crimes. The officer questioned the defendant about the theft of the vehicle, and he also "asked if [the defendant] had been involved in other burglaries." *Id.* at 335. The defendant made admissions about two other burglaries in addition to the Elling burglary. Applying *Sparklin*, we concluded that the questions about the burglary involving the car were impermissible:

> "The burglary and the original charge of unauthorized use of the stolen Elling car arose out of the same 'concatenation of facts.' Accordingly, [the officer's] initiation of discussions about the Elling burglary were impermissible."

*Staunton*, 79 Or App at 338 (citing *State v. Taylor*, 56 Or App 703, 643 P2d 379 (1982)).[4] We did not, however, decide whether the two other burglaries were "factually related." Rather, we concluded that the questions about those burglaries were "tainted" by the unlawful questioning about the Elling burglary and that the defendant's answers to those questions must be derivatively suppressed. *Id.* at 338-39.

In *State v. Hill*, 142 Or App 189, 921 P2d 969 (1996), *rev den*, 327 Or 521 (1998), we applied *Sparklin* in the context of an aggravated murder sentencing. After the defendant had been arrested and arraigned on aggravated murder charges in Benton County, a Marion County police officer who had assisted in the Benton County investigation sought to interview the defendant about two crimes that were factually unrelated to the Benton County charges. The officer told the defendant that, "because [the] defendant was in so much trouble in Benton County, those cases probably would not be prosecuted." *Id.* at 192. The defendant then made

---

[4] Interestingly, *Taylor* involved the same facts as *Sparklin*. Both defendants were implicated in the same crimes in those cases. In *Taylor*, only a federal constitutional question concerning the Sixth Amendment was presented, and it concerned the then-applicable federal constitutional analysis, which has since been significantly altered.

incriminating admissions about those crimes and several other crimes. Although no charges were ever pursued concerning those crimes, the state offered evidence of the defendant's admissions at the sentencing hearing in the Benton County case. On appeal, we concluded that, although the questioning concerned matters that were "factually unrelated" to the Benton County crimes, the evidence was nevertheless inadmissible in the Benton County case because the defendant's right to counsel under Article I, section 11, had attached. Because the defendant's participation in other crimes would be relevant and admissible at sentencing on the Benton County aggravated murder charges, the uncounseled questioning about those other crimes violated Article I, section 11. *Id.* at 197.

In *State ex rel Juv. Dept. v. O'Farrell*, 191 Or App 627, 83 P3d 931 (2004), *rev den*, 339 Or 230 (2005), a youth had been charged with animal abuse for killing a dog. *Id.* at 629. After the court appointed counsel for the youth, several police officers who were aware of the pending charges involving the dog questioned the youth about a factually unrelated matter involving the abuse of a cat. Before turning to the legal question presented in that case, we recited the following background:

> "The parties agree that the trial court correctly ruled that, because youth was represented by counsel regarding the dog case at the time of the interview, in discussing that case the detectives violated youth's right to counsel under Article I, section 11, of the Oregon Constitution * * *. *State v. Sparklin*, 296 Or 85, 93, 672 P2d 1182 (1983) * * *. They also agree that the detectives could lawfully question youth concerning the cat case because he had not been charged with that conduct and it was not inextricably intertwined with the dog case. *Sparklin*, 296 Or at 95; *State v. Hill*, 142 Or App 189, 195-96, 921 P2d 969 (1996), *rev den*, 327 Or 521 (1998). Finally, the parties agree that youth voluntarily waived his *Miranda* rights. The parties frame the issues before this court as (1) whether the detectives exploited the unlawful discussion of the dog case to obtain youth's admissions in the cat case, and (2) whether the statements made by youth after the detectives mentioned the dog case were voluntary."

*O'Farrell,* 191 Or App at 637. We made no reference to *Sparklin* apart from the foregoing observation that there was no *Sparklin* issue presented on appeal. The parties agreed that *Sparklin* was not implicated because the cat case "was not inextricably intertwined with the dog case." However, the parties' framing of the *Sparklin* test in *O'Farrell* was not dispositive in the latter case. Rather, the issues in *O'Farrell* were (1) whether evidence of the factually unrelated matter should be derivatively suppressed because the police had exploited earlier information that they had unlawfully obtained, and (2) whether the youth's statements were voluntary. *Id.* at 631, 632-36. In short, neither *O'Farrell* nor any other appellate decision supports the state's premise that, for matters to be "factually related" under *Sparklin,* the facts must be "inextricably intertwined."

Our task, then, is to determine the meaning of the term "factually unrelated," for purposes of *Sparklin,* as it relates to the circumstances here. As can be seen from our previous decisions, we have not examined that question in depth. In *Staunton,* we noted that the stolen car provided the necessary factual link between the initial driving offenses and the burglary in which the car was stolen. 79 Or App at 338. That situation was comparable to the circumstances in *Sparklin,* where the credit cards provided the necessary factual link. The state makes much of the fact that, unlike the circumstances in *Sparklin* and *Staunton,* the physical evidence in the present cases, that is, the various checks, was not identical and, moreover, that the victims in the two cases were different. Although that is true, a number of countervailing factors preponderate in favor of the conclusion that the two matters were factually related.

First, two detectives from different precincts in the same jurisdiction—Malanaphy and Glass—were investigating remarkably similar crimes, perpetrated within close temporal proximity, and involving the same suspect—defendant. Malanaphy contacted Glass because he learned about her investigation of charges that were similar to the crimes he was investigating. Glass, in turn, was able to provide Malanaphy with specific information about two additional counterfeit checks relating to his case. The detectives believed that the crimes were perpetrated by defendant

using a home computer to create false checks. Both detectives went to defendant's home together to question his wife about defendant's accomplices. In short, they were working together to glean evidence relating to defendant, defendant's computer, and defendant's accomplices that might be relevant to either or both of their cases. Finally, although his specific questions related to the APF case, not the BTS case that Glass was investigating, Malanaphy encouraged defendant to reveal information about other crimes beyond the ones committed in the APF case. Indeed, in response to Malanaphy's questioning, defendant made admissions about using a computer to create fraudulent checks that were relevant to, and were used against him in, both of these consolidated cases.

In sum, the crimes in the consolidated cases were remarkably similar, involved overlapping evidence, and were committed in the same jurisdiction within close temporal proximity to each other, and the detectives investigating both sets of crimes were working collaboratively. In such circumstances, and where defendant had been charged in one of the cases and counsel had been appointed for him in that case, defendant was "entitled to the benefit of an attorney's presence, advice and expertise in any situation where the state may glean involuntary and incriminating evidence or statements for use in the prosecution of its case against defendant." *Sparklin*, 296 Or at 93. We conclude that the BTS case and the APF case were factually related, and as a consequence, Malanaphy was not entitled to question defendant concerning the BTS case without first contacting defendant's attorney. The trial court therefore erred in denying defendant's motion to suppress the challenged evidence.

Reversed and remanded.