Argued and submitted November 8, 2013, in Case No. C11-1693CR, affirmed; in
Case No. C11-2523CR, convictions on Counts 1 and 2 reversed and remanded;
remanded for resentencing; otherwise affirmed April 2, petition for review
allowed August 7, 2014 (355 Or 879)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JESUS R. PRIETO-RUBIO,
*Defendant-Appellant.*

Washington County Circuit Court
C11693CR, C112523CR;
A152030 (Control), A152033

324 P3d 543

John J. Tyner III argued the cause and filed the briefs for appellant.

Michael R. Salvas, Assistant Attorney General, argued the cause for respondent. On the answering brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Douglas F. Zier, Senior Assistant Attorney General. With him on the supplemental brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Garrett, Judge, and Schuman, Senior Judge.*

GARRETT, J.

---

* Garrett, J., vice Wollheim, J.

## GARRETT, J.

This consolidated appeal concerns defendant's convictions for sexual offenses against three victims, AG, KM, and LP. In Case No. C11-2523CR, defendant was convicted of sexual abuse in the first degree based on his conduct with LP (Count 1) and KM (Count 2).[1] In Case No. C11-1693CR, he was convicted of two counts of attempted sexual abuse in the first degree based on his conduct with AG. On appeal, defendant makes two assignments of error. In the first, he "seeks reversal of his convictions [in Case No.] C11-2523CR." Specifically, defendant contends that the trial court erred in denying his motion to suppress statements that he made during a police interview without counsel present. In the second assignment, defendant, in a supplemental brief, contends that the trial court erred in denying his motion for judgment of acquittal.[2] Because defendant's second assignment of error was not preserved, we address only the first assignment of error.

In that assignment, defendant argues that, as to the two counts of sexual abuse against KM and LP, the trial court erred in denying defendant's motion to suppress evidence obtained when a detective interviewed defendant without first notifying defendant's attorney. Whether

---

[1] Defendant was acquitted of a third count of first-degree sexual abuse in that case.

[2] Defendant's second assignment of error is predicated on his contention that the trial court erred in admitting all three victims' eyewitness observations. He asserts that he preserved that contention when he moved for a judgment of acquittal after the close of the state's case. In defendant's argument to the court, he noted that the state's witnesses had made inconsistent statements about when each instance of sexual abuse had occurred and when they had spoken with each other about the abuse. Defendant suggested to the court that the witnesses' memories may have been affected by those conversations. As the state points out, however, at no point did defendant actually move to exclude the victims' testimony. Moreover, in context, it is clear from the record that defendant's arguments about the victims' memories were directed at the weight of the testimonial evidence and not its admissibility. In short, the issue of whether the eyewitness testimony should have been excluded as unreliable was not brought to the trial court's attention and is not preserved on appeal. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted."). Because the second assignment of error is the only challenge to the trial court's judgment in Case No. C11-1693CR, we affirm the judgment in that case.

the detective was required to contact defendant's attorney turns on whether the instances of sexual abuse in this case, involving the same defendant but different victims at different times, were "factually related" for purposes of Article I, section 11, of the Oregon Constitution. We conclude that the incidents were factually related, that defendant's attorney should have been notified, and that defendant's motion to suppress therefore should have been granted. Accordingly, we reverse and remand defendant's convictions on Counts 1 and 2 in Case No. C11-2523CR and remand that case for resentencing but otherwise affirm.

## BACKGROUND

The parties do not dispute the relevant facts. The three girls, AG, KM, and LP, are members of defendant's extended family. On August 9, 2011, AG was evaluated at Child Abuse Response Evaluation Services Northwest (CARES) in connection with an allegation that she had been sexually abused the previous day. During her evaluation, AG said that she had spent time in defendant's home and that he had touched her breasts and vaginal area. AG also reported that KM and LP had spent time at defendant's home and might have been abused by defendant.

Detective Rookhuyzen attended and observed AG's evaluation at CARES. Later that day, Rookhuyzen traveled to defendant's home and interviewed him. At the conclusion of the interview, defendant was arrested and taken into custody. Rookhuyzen conducted a second interview later that day after defendant waived his *Miranda* rights. The second interview was primarily about AG, but Rookhuyzen also asked defendant about other children who had visited his house. During that interview, KM's name was specifically mentioned but LP's was not. Defendant was subsequently charged with first-degree sexual abuse of AG in Case No. C11-1693CR. He retained counsel.

Over the following several weeks, Rookhuyzen continued to investigate AG's references to other possible victims. In September 2011, KM and LP were both interviewed at ABC House, another child-advocacy center. Both KM and LP described instances in which they had separately visited defendant's home and he had touched their vaginal areas.

On October 5, 2011, Rookhuyzen interviewed defendant a third time at the Washington County Jail, where defendant was being held on the charges pertaining to AG. There is no dispute that Rookhuyzen was aware that defendant was represented by counsel in the case concerning AG, but Rookhuyzen did not contact defendant's counsel prior to the interview. During that interview, defendant made incriminating statements concerning KM and LP. He was subsequently charged with three counts of sexual abuse in the first degree, two counts regarding KM and one count regarding LP in Case No. C11-2523CR.

The indictment in Case No. C11-1693CR alleged, with regard to the first count, that defendant abused AG "on or between August 7, 2011 to August 8, 2011." With regard to the second count, the indictment alleged that defendant abused AG "on or about August 7, 2011." The indictment in Case No. C11-2523CR alleged that defendant abused LP "on or between January 1, 2010 and January 1, 2011" and abused KM "on or between August 31, 2009 and January 1, 2011." Thus, the time period in which the three victims were alleged to have been abused was potentially as long as two years, August 1, 2009 to August 8, 2011.

On the state's motion, the two cases were consolidated for trial. In support of its motion, the state informed the trial court that "the crimes alleged against * * * defendant involve many of the same witnesses and arise from the same investigation." The state asserted further that "the crimes alleged against * * * defendant are of the same or similar character and show a common scheme or plan."

Prior to trial, defendant moved to suppress evidence of the statements that he had given about KM and LP in the third interview. Defendant argued that the interview was conducted in violation of his right to counsel under Article I, section 11, because Rookhuyzen, who knew that defendant was represented by counsel, failed to notify defendant's counsel before the interview. At the hearing on defendant's motion to suppress, Rookhuyzen agreed with defense counsel that, during all three of his interviews with defendant, he and defendant had "talked about the universe of kids who came to [defendant's] house during a two-year period

of time." Rookhuyzen also testified that, during the second interview, he learned some information about KM that led Rookhuyzen to believe that KM may have been sexually abused by defendant. He testified further that, in the third interview, "the focus is on the new victims. They were the ones that I lacked any statement from the defendant about. That was—that was the focus, yeah, [LP] and [KM]. That was the focus of that third interview in the jail." Rookhuyzen also explained, regarding the third interview, that

> "I think it's impossible to have a conversation with [defendant] and not have some overlap. These are family members. So I mean, I think that it's fair to say, you know, a name might have come up.

> "But at this point, he'd been charged on the first victim, and I was completely focused on victims two and three."

The trial court denied defendant's motion to suppress the statements, reasoning as follows:

> "And the fact that the cases appear to be related, because, of course, first of all, they're—the allegations are against [defendant]; that they're from minors; and that they involve his house is sufficiently similar to say that they are the same. And that the representation of counsel is to the offense charged, which would have been the offenses charged initially, not the ones related to by the officer that were charged after that, because they involved a different time frame and different victims and result in the allegations of different crimes.

> "So the statements would then be admissible against the defendant as not in violation of *Miranda* and not involuntary. And that would be my order on that."

A bench trial was held; defendant renewed his suppression arguments unsuccessfully in a motion for judgment of acquittal. In Case No. C11-2523CR, defendant was convicted on one count of sexual abuse in the first degree as to LP (Count 1) and one count of sexual abuse in the first degree as to KM (Count 2). Defendant was also convicted of two counts of attempted sexual abuse in the first degree in Case No. C11-1693CR. The trial court sentenced defendant

to 19 months in prison on each attempt conviction, to be served concurrently, and to the mandatory minimum term of 75 months on both counts of sexual abuse, also to be served concurrently. The court ordered that 15 months of the 19-month sentences in Case No. C11-1693CR be served consecutively with the 75-month sentences in Case No. C11-2523CR, for a total term of 90 months.

## DISCUSSION

On appeal, defendant contends that the trial court erred in denying defendant's motion to suppress the evidence of the statements that defendant gave to Rookhuyzen about KM and LP in the third interview. Defendant contends that that interview violated his constitutional right to counsel.

We review the trial court's denial of defendant's motion for errors of law. *State v. Ehly*, 317 Or 66, 74, 854 P2d 421 (1993). In so doing, we consult the record as it existed at the time of the alleged error and not "as it may have developed at some later point." *State v. Pitt*, 352 Or 566, 575, 293 P3d 1002 (2012). We consider all pertinent portions of the record, however, when determining whether an error was harmless. *State v. Cunningham*, 179 Or App 359, 362 n 2, 40 P3d 1065 (2002), *rev'd on other grounds*, 337 Or 528, 99 P3d 271 (2004).

Article I, section 11, provides, in part, that, in "all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel[.]" That provision means, among other things, that "once a person is charged with a crime he or she is entitled to the benefit of an attorney's presence, advice and expertise in any situation where the state may glean involuntary and incriminating evidence or statements for use in the prosecution of the case against defendant." *State v. Sparklin*, 296 Or 85, 93, 672 P2d 1182 (1983). That rule necessarily limits the state's ability to interrogate criminal defendants who have been charged with a crime. "Once an attorney is appointed or retained, there can be no interrogation of a defendant concerning the events surrounding the crime charged unless the attorney representing the defendant on that charge is notified and afforded a reasonable opportunity to attend." *Id.*

The requirement that police notify a defendant's attorney prior to further interrogation, however, is limited. As the Supreme Court further explained,

"[i]t is the fairness of the 'criminal prosecution' which counsel's presence helps to ensure. For this reason the article I, section 11 right to an attorney is specific to the criminal episode in which the accused is charged. The prohibitions placed on the state's contact with a represented defendant do not extend to the investigation of *factually unrelated criminal episodes.*"

*Id.* at 95 (footnote omitted; emphasis added).

In *State v. Potter*, 245 Or App 1, 260 P3d 815 (2011), we considered whether two criminal episodes were "factually unrelated" within the meaning of *Sparklin*. *Potter* involved two sets of forged checks, one drawn on the account of "APF" and the other on the account of "BTS." 245 Or App at 3. The defendant was charged in the APF case and obtained counsel. *Id.* Shortly thereafter, a different detective investigating the BTS checks learned about the APF case and began exchanging information with investigators on that case. *Id.* at 4. Police then interviewed the defendant about the BTS checks without notifying his attorney; the defendant was charged in the BTS case on the basis of incriminating statements made during that interview. *Id.*

On appeal, we held that the APF and BTS episodes were factually related and that, as a result, the police were "not entitled to question [the] defendant concerning the BTS case without first contacting [the] defendant's attorney." *Id.* at 11. We reasoned that the crimes were "remarkably similar, involved overlapping evidence, and were committed in the same jurisdiction within close temporal proximity to each other." *Id.* We also noted that "the detectives investigating both sets of crimes were working collaboratively," that is, "working together to glean evidence relating to [the] defendant, [the] defendant's computer, and [the] defendant's accomplices that might be relevant to either or both of their cases." *Id.*

*State v. Plew*, 255 Or App 581, 298 P3d 45 (2013), is also instructive. *Plew* involved two burglaries, one on

Benham Lane and one on Holly Lane. *Id.* at 584. The defendant was arrested and charged with the Benham Lane burglary; he retained counsel. *Id.* After questioning an accomplice and photographing stolen items in the defendant's apartment, police began to suspect the defendant's involvement in the Holly Lane burglary. *Id.* They interviewed the defendant about the Holly Lane burglary without informing his attorney. *Id.* At trial, the defendant moved unsuccessfully to suppress the incriminating statements he made during that interview. *Id.* at 584-85. On appeal, the state argued that "[t]he crimes were part of two different criminal episodes" because the defendant committed "two distinct burglaries * * * eight days apart." *Id.* at 588-89 (emphasis added). We rejected that argument. In doing so, we noted that, in *Potter*, we had held that two distinct crimes were nonetheless factually related for the purposes of a right-to-counsel analysis. *Id.* at 589 (citing *Potter*, 245 Or App at 11). As we explained in *Plew*, the defendant in *Potter*

> "was suspected of creating multiple fraudulent checks that were drawn on two different accounts, and attempting to cash one of them. Moreover, contrary to the state's assertion, our decision in *Potter* was not predicated on the notion that the defendant's acts in creating fraudulent checks on his computer may well have occurred at or near the same time. Rather, we noted, as one of many considerations, that the defendant's alleged crimes were committed within close temporal proximity."

*Id.* (citing *Potter*, 245 Or App at 11) (internal quotation marks and emphasis omitted).

We turn now to whether the criminal episodes involving AG, KM, and LP were "factually related" for purposes of defendant's right to counsel. The state argues that the crimes involved different victims over a relatively long period of time (as long as two years) and, thus, were not part of the same "criminal episode" or "scheme." The state also points out that, unlike in *Potter* and *Plew*, there is no "overlapping evidence" here that links the conduct with the three victims.

It is true that this case does not present the same "temporal proximity" that we found to be important in

*Potter.* As we made clear in *Plew*, however, that is but "one of many considerations." The fact that the incidents here were separated by as much as two years is a factor that weighs against a conclusion that they were factually related, but it is by no means dispositive.

It is also true that, at the time of the court's ruling on defendant's motion to suppress, the record did not demonstrate the existence of a specific, and critical, piece of evidence that would be relevant to more than one of the charges against defendant. That is in contrast to *Potter*, in which the defendant admitted to using the same computer to create both sets of forged checks, and to *Plew*, in which the defendant made an incriminating statement indicating that he committed both robberies.

Other factors in this case, however, support a conclusion that the crimes were factually related. The crimes all occurred at defendant's home and involved similar types of physical conduct toward victims who were all children, female, and related to defendant. The state acknowledged those similarities in its motion to consolidate the two cases against defendant, where the state took the position that "the crimes alleged against * * * defendant are of the same or similar character and show a common scheme or plan[.]" The state's affidavit also asserted that "the crimes alleged against * * * defendant involve many of the same witnesses and arise from the same investigation."

This does not mean, of course, that crimes against different victims must be deemed "factually related" whenever they are committed by the same defendant and involve similar conduct. Rather, there are additional circumstances present in this case that implicate the concerns underlying the discussion of the right to counsel in *Sparklin* and *Potter*. Specifically, we note that the same detective handled the investigation as to all three victims. In *Potter*, we found it important that the investigators handling the different crimes were working "collaboratively." 245 Or App at 11. In this case, Rookhuyzen was the principal investigator from the beginning, when he attended AG's evaluation at CARES and learned that KM and LP were additional family members who were potential victims of defendant. In

other words, Rookhuyzen knew from the outset of a possible pattern of conduct by defendant toward children in his extended family, and Rookhuyzen questioned defendant about the possibility of multiple victims beginning with the second interview. Thus, from the moment that Rookhuyzen learned about KM and LP from AG, the state effectively conducted a single, unified investigation of defendant's crimes.

In addition, although Rookhuyzen testified that he was "focused" on KM and LP in the third interview, he also acknowledged that each of his interviews with defendant covered the "universe" of potential victims; furthermore, Rookhuyzen said that because all three girls were family members, it was "impossible" to "not have some overlap" when questioning defendant about the different episodes. In light of that, it was foreseeable that additional information about *AG's case* might have emerged in the third interview. The third interview thus meets the description in *Sparklin* of "any situation where the state may glean involuntary and incriminating evidence or statements for use in the prosecution of its case against [a] defendant." 296 Or at 93. In other words, regardless of whether the third interview actually produced additional incriminating information about defendant's conduct toward AG, it is plain that that was a distinct possibility.

The circumstances here call to mind our discussion in *Potter*, where we concluded that "we cannot simply take at face value the [Supreme Court's] statement that the Article I, section 11, right 'is specific to the criminal episode in which the accused is charged.'" *Potter*, 245 Or App at 7 (quoting *Sparklin*, 296 Or at 95). We reasoned that to do so would allow the state to easily avoid the limits that Article I, section 11, places on its power to interrogate criminal defendants without informing their attorneys. For example, the state could strategically delay filing certain charges against a defendant, interrogate that defendant about those uncharged crimes without informing his attorney, use evidence gleaned from that interrogation to file an additional charging instrument, and then consolidate the charges for trial. *Id.* Avoiding such an incentive structure is one reason we concluded that the focus of the inquiry should

be on whether criminal episodes are "factually related," not on how they happen to be charged. *Id*. There is no evidence in this case to suggest that the police strategically delayed charging defendant with the crimes against KM and LP. The point is that, because the criminal episodes were handled by the same investigator who apparently treated them as linked from the very beginning, this is precisely the type of case where the state *could* have engaged in such strategic delay, the avoidance of which was an important consideration in *Potter*.

We conclude from the record before us that the criminal episodes involving AG, KM, and LP had a sufficient nexus so as to be factually related for purposes of defendant's Article I, section 11, right to have his counsel notified prior to the third interview. The trial court therefore erred in denying defendant's motion to suppress the evidence of statements that he made during that interview. Moreover, the court's error was certainly prejudicial to defendant; the court specifically relied upon statements that defendant made during the third interview as evidence that "he knew exactly what he was doing."[3] Accordingly, the trial court erred in denying defendant's motion to suppress the evidence of defendant's statements to Rookhuyzen about KM and LP in the third interview.

In Case No. C11-1693CR, affirmed; in Case No. C11-2523CR, convictions on Counts 1 and 2 reversed and remanded; remanded for resentencing; otherwise affirmed.

---

[3] In finding defendant guilty, the court stated:

"I looked to some of my notes in regard to [Case No. C11-2523CR] and the conversation that the detective had with [defendant] in the jail cell and statements like, 'My hand slid back down. Why am I doing this? I can't understand myself. I pulled out my hand under the'—I mean, all those statements I think contribute to the fact that he knew exactly what he was doing."