LAGESEN, P. J.
*276 *19 While facing four charges of felon in possession of a firearm (FIP), defendant shot and killed his neighbor, who defendant believed had set him up on two of the charges. After defendant was arrested, officers interrogated him mainly about the homicide, but also about the FIP charges, without first notifying the lawyer representing defendant on the FIP charges. The issue before us is whether the officers violated defendant's rights under Article I, section 11, of the Oregon Constitution when they questioned him without notifying his lawyer and giving the lawyer an opportunity to attend the interrogation and, if so, the extent to which that constitutional violation requires the suppression in the homicide case of the statements that defendant made during the interrogation.
We conclude that, under State v. Prieto-Rubio , 359 Or. 16, 376 P.3d 255 (2016), the officers violated defendant's rights under Article I, section 11, when they continued to question defendant without notifying his lawyer once it became apparent that there was a connection between the FIP charges and the homicide, when defendant disclosed that his motive for shooting the victim was his belief that the victim had set him up on the FIP charges. We conclude further that, under State v. Savinskiy , 286 Or. App. 232, 399 P.3d 1075, rev. allowed , 362 Or. 208, 407 P.3d 815 (2017) ; State v. Hensley , 281 Or. App. 523, 383 P.3d 333 (2016) ; State v. Beltran-Solas , 277 Or. App. 665, 372 P.3d 577 (2016) ; and State v. Staunton , 79 Or. App. 332, 718 P.2d 1379 (1986), the violation of defendant's rights requires suppression of the statements that defendant made after the violation occurred. Because the trial court concluded otherwise, and the error was not harmless, we reverse and remand.
STANDARD OF REVIEW
We review the trial court's denial of defendant's motion to suppress for legal error. Hensley , 281 Or. App. at 525, 383 P.3d 333. In so doing, we take the facts as the trial court expressly or necessarily found them, so long as there is evidence to support those findings. Id . at 526, 383 P.3d 333.
*20 FACTUAL AND PROCEDURAL BACKGROUND
In 2011, defendant was facing charges on four counts of felon in possession of a firearm. The state had brought two of the charges many years earlier, in 1991 and 1994,[1] and had brought the other two in 2011. Defendant retained an attorney, Gushwa, to represent him on those charges. Gushwa sent a notice to the district attorney's office directing it to "[p]lease instruct all police officers and personnel of your office not to speak with the defendant without first obtaining written permission from me."
The trial court scheduled a status conference in that FIP case for December 30 of that year. That morning, defendant, who was out on bail, was waiting for his ride to court when he noticed that Carter, the owner of a nearby plumbing shop, was on defendant's property, examining defendant's preparations for building a fence. A short time later, after Carter had returned to his shop, defendant walked to the shop, pointed a handgun at Carter through a closed window, and fired eight times. Five bullets struck Carter, two of which were fatal. Defendant fled the scene and (according to defendant) hid in a nearby cave for two days.
In the meantime, defendant's lawyer, Gushwa, was waiting for him to show up at the status conference on the FIP charges.
*277 When defendant failed to appear, Gushwa told the court that, absent a "disastrous car wreck" that might explain his client's absence, he planned to move to withdraw as counsel. After the hearing, Gushwa called defendant's house. Brooks, who had been staying with defendant, answered the phone and put Gushwa on the phone with a detective, Guerrero, who was next door investigating the shooting. Although he had not yet filed a motion to withdraw as counsel in the FIP case, Gushwa told Guerrero that he had withdrawn from the FIP case and that, if he spoke with defendant, he would tell defendant that police wanted to talk to him.
Two days later, on New Year's Day, defendant went to the home of Cossitt, a mutual friend of defendant and the *21 victim. Cossitt called the police and they arrested defendant later that day. Detectives Gunter and Guerrero set up recording equipment and prepared to interrogate defendant. Both were aware of the FIP charges, but had been told that Gushwa had withdrawn, although Gushwa had not, in fact, withdrawn at the time. They gave defendant Miranda warnings and asked if he was willing to talk to them. Defendant initially said he was "not really" willing to talk but then immediately said they could ask him questions and signed a waiver form.
Although the detectives did not ask defendant about the FIP charges initially, defendant volunteered information about the 1991 and 1994 charges early in the interview. After defendant explained to the detectives that his primary line of work had been a specialized form of painting for military bases, Gunter asked if defendant had been required to obtain a special security clearance to do that work. Defendant explained that he had been, and that he had "passed every clearance," which is why it surprised him to find out that he still had warrants on the 1991 and 1994 charges. Defendant further explained that "what's got me pissed off" was the fact that, when he originally was convicted on felony charges in 1986, the judge told him that the convictions would not affect his ability to own firearms. Then, "in '89 they changed the law where all felons can't have guns," but defendant did not find out about the change in the law until he wanted to go hunting in 1991 and an officer came to take his guns. Defendant also stated that the fact that he "love[d] to hunt" led to the additional charge in 1994.
After some additional discussion of defendant's love of hunting, the detectives shifted the focus of the interview to the shooting of Carter. Gunter told defendant that the detectives knew what happened, "[s]o what we want to do with you today is just talk to you about why it happened." Defendant then explained to the officers how he had obtained the money for bail on the FIP charges, and that he had been planning to repay the person who had loaned him the money either by logging his property to get the money, or by selling the lender his house. Defendant told the officers that "I was going to sell the house to him but I didn't want *22 to sell it," but that "my old lady is being a bitch and them folks brainwashed her some." Guerrero followed up on what defendant meant, at which point defendant explained his belief that the victim and his family had set him up on the 2011 charges:
"[Guerrero:] Who's 'them folks'?
"[Defendant:] The folks next door.
"[Guerrero:] The Carters?
"[Defendant:] Yeah. They set it up. That's how I found out about all that shit.
"[Guerrero:] Set what up?
"[Defendant:] How to get me in jail and try to keep me there.
"[Guerrero:] Okay.
"[Defendant:] With the firearms."
At that point, Gunter took over questioning defendant. He asked defendant directly about how he had come into possession of the firearms underlying the 2011 FIP charges:
"[Gunter:] Did they give you the firearms? Where did you get those firearms?
"[Defendant:] They were in the house when my dad died.
"[Gunter:] And you just kind of inherited them?
"[Defendant:] Yeah. They were family guns.
"[Gunter:] Okay.
"[Defendant:] I took them up to a friend's house, and then [the victim] fucking-his *278 brother works for him-and [the victim] kind of wouldn't let [the friend] take them to another friend's house. They wanted to keep them there so they could turn them into the cops so I could get more time."
At that point, Guerrero observed, "Oh, so they set you up that way." Defendant agreed that "[t]hat's one way they did it."
*23 Gunter and Guerrero continued the interview, further exploring with defendant his motive for shooting the victim. Defendant made a number of statements indicative of his state of mind at the time of the shooting, including that he was "going to shoot the son-of-a-bitch" if he was "going to do that much time" on the FIP charges; that he wished that the victim's daughter would "have been there that day" because he "would have fed her some lead;" and that he had "[w]ent off just crazy" but was "[c]alm as fuck, though" at the time he went up to the window and shot through it. At several points during the interview, he also reiterated his belief that the victim had set him up on the 2011 FIP charges to ensure that defendant received a long prison sentence. And, when asked whether he would "take back what happened to" the victim if he could, defendant responded that it "would be hard to answer that question," under the circumstance.
Defendant was charged with, among other things, murder ( ORS 163.115 ) (Count 1), felon in possession of a firearm ( ORS 166.270 ), unlawful use of a weapon ( ORS 166.220 ), and obliteration or change of identification number on a firearm ( ORS 166.450 ).[2] He moved to suppress evidence of the statements that he made during his custodial interview, together with any derivative evidence, on the ground that it had been obtained in violation of his right to counsel under Article I, section 11. Defendant argued that, under the circumstances of this case, the homicide was sufficiently related to the FIP charges that, under State v. Sparklin , 296 Or. 85, 672 P.2d 1182 (1983), the officers' failure to notify his lawyer on those charges about the interrogation required suppression of the entire interview. Alternatively, he asserted that, even if it had been permissible for the officers to start the interrogation without contacting defendant's lawyer, once it became clear that there was a relationship between the FIP case and the homicide, the detectives should have stopped the interview and contacted counsel:
"What this court has to focus on is, given what the detectives knew at the time, which is that he was represented by counsel in, as it turns out, a very-as the story develops, a *24 factually related matter, once it became clear to them that it was factually related, they at the very minimum needed to stop-stop and contact counsel, Mr. Gushwa, and cease any further-I submit the interrogations should never have started, because they knew it was factually related, but once it started, it became clear they were discussing gun charges very clearly at the outset. He's represented by counsel. It needs to go no further."
The state responded that, under the considerations set forth in State v. Potter , 245 Or. App. 1, 260 P.3d 815 (2011), rev. den , 351 Or. 586, 274 P.3d 857 (2012), the FIP charges were not factually related to the homicide such that Article I, section 11, did not require the detectives to contact defendant's lawyer on the FIP charges. Although the state acknowledged "that the defendant himself cannot talk about the murder without talking about the felon in possession of a firearm case," the state argued that the matters should be deemed unrelated because, in the state's view, it could prove the murder charges without reference to the FIP charges. In response to the court's question about whether the detectives should have stopped questioning defendant and contacted his lawyer once defendant brought up the firearm cases, rather than asking defendant directly about those charges, the state responded that it needed to do so only if the factors identified in Potter were present; "if these five factors come into play, and there is some sort of factual link or relatedness, that's when we have to deal with it."
The trial court ultimately denied the motion to suppress. Relying largely on Potter , *279 the court concluded that the FIP charges were not factually related to the homicide, because they were not temporally connected, did not involve overlapping evidence, did not involve similar charges, and did not involve the same investigative teams. The court recognized that the detectives "potentially intermixed questions about the felon in possession cases with the questions about the murder," but concluded, nonetheless, that intermingling of questions about both cases did not make the matters factually related so as to require suppression of any evidence in the homicide case. The court also observed that "the state has stated in writing that it will not use any information gained in the January 1 interview for sentencing if *25 defendant is found guilty or any other purpose in the felon in possession cases." That concession, the court reasoned, further supported the conclusion that suppression was not required in the homicide case.
At trial, defendant did not dispute that he had shot Carter. Instead, his defense was that the shooting was a product of an extreme emotional disturbance (EED), ORS 163.135, or that defendant was guilty except for insanity (GEI), ORS 161.295. Defendant's interrogation was played for the jury in its entirety. In closing, the state relied on defendant's statements in the interview to argue that defendant was not suffering from delusions at the time of the killing but, instead, intentionally shot the victim because he was angry with him. The jury rejected defendant's defense and convicted him of murder, FIP, unlawful use of a weapon, and obliteration of identification on a firearm. For his murder conviction, the trial court sentenced defendant to life with the possibility of parole after 25 years. For the FIP conviction, the trial court sentenced defendant to 24 months in prison, consecutive to the murder sentence. For unlawful use of a weapon, the trial court sentenced defendant to 24 months in prison, concurrent with the murder and FIP sentences. For obliteration or change of identification on a firearm, the court ordered a sentence of discharge.
Defendant appealed. In his first assignment of error,[3] he contends that the trial court erred in denying his motion to suppress his statements in the January 1 interrogation, reiterating his argument that the detectives violated his rights under Article I, section 11, when they conducted the interview without notifying his lawyer on the pending FIP charges. The state responds that, under the test set forth in Prieto-Rubio , decided after the trial court rendered its decision in this matter, the trial court's denial of the motion to suppress was not erroneous.
*26 ANALYSIS
As mentioned, after the trial court rendered its decision in this matter, the Supreme Court decided Prieto-Rubio , a case that significantly refined the analysis of when Article I, section 11, permits officers to question a suspect who is represented by counsel on pending charges about a different matter without first alerting the suspect's lawyer on the pending charges. Notwithstanding the fact that Prieto-Rubio requires a different analysis than that in which the trial court engaged, neither party appears to dispute that it is appropriate for us to determine whether, under the standard set forth in Prieto-Rubio , defendant's motion to suppress should have been granted. Applying that standard, we conclude that it should have been granted in part.
In Prieto-Rubio , the Supreme Court explained that once a defendant has been charged with a crime, the right to counsel attaches and Article I, section 11, prohibits law enforcement from asking a defendant about that crime without first notifying the defendant's lawyer. 359 Or. at 18, 376 P.3d 255. Additionally, there can be "no interrogation of a defendant concerning the events surrounding the crime charged unless the state first notifies the defendant's lawyer and *280 provides counsel a reasonable opportunity to attend." Id . at 29, 376 P.3d 255. "[T]he appropriate test for determining the permissible scope of questioning of a criminal defendant who is represented by counsel is whether it is objectively reasonably foreseeable that the questioning will lead to incriminating evidence concerning the offense for which the defendant has obtained counsel." Id . at 18, 376 P.3d 255. In other words,
"whether charged and uncharged offenses are sufficiently related as to implicate the state constitutional right to counsel will depend on the facts and circumstances of each case and whether they establish that it is reasonably foreseeable to a person in the position of the questioner that the questioning will elicit incriminating information involving the charged offense for which the defendant has obtained counsel. That is an objective test that does not turn on the subjective impression of the questioner."
Id . at 36-37, 376 P.3d 255. The court reasoned that the rule it adopted was necessary to protect the broad right to the assistance of counsel recognized in Sparklin :
*27 "As the court in Sparklin explained, the purpose of the Article I, section 11, right is to ensure that a defendant charged with a crime has the benefit of an attorney's presence, advice, and expertise 'in any situation where the state may glean involuntary and incriminating evidence or statements for use in the prosecution of its case against defendant.' 296 Or. at 93 [672 P.2d 1182] (emphasis added). Just because police ask questions carefully avoiding the facts immediately surrounding the criminal episode of the charged offense does not necessarily mean that those questions will not elicit information that is incriminating about that charged offense. It would seem to follow from Sparklin that, to the extent that questioning about uncharged offenses may foreseeably lead to such incriminating information about the charged offense, it is foreclosed by the state constitutional right to counsel. Otherwise, the state constitutional guarantee of the right to counsel would be circumvented."
Prieto-Rubio , 359 Or. at 36, 376 P.3d 255.
Applying that standard to the facts of this case, we conclude that, after defendant disclosed his belief that the victim had set him up on the 2011 firearm charges, the officers' continued questioning violated defendant's rights under Article I, section 11. It was not reasonably foreseeable at the outset of the interrogation that questioning about the homicide would lead to information about the FIP charges, given many of the considerations identified by the trial court: the FIP charges were different in nature from the homicide, were separated from the homicide by a substantial amount of time, and were investigated by different officers.[4] It also did not become reasonably foreseeable that continued questioning would elicit information about the FIP charges even after defendant volunteered information about the 1991 and 1994 charges. Defendant's mentioning of those charges was not responsive to the officers' questions, and there was little reason for the officers to think that an interview focusing on a homicide occurring in 2011 would elicit more information about defendant's possession of firearms decades earlier.
*28 That changed, however, when defendant explained to the officers that he thought the victim's family had set him up on the firearm charges. Once defendant disclosed to detectives that there was a connection between the 2011 firearm charges and his animosity toward the victim and his family, it became reasonably foreseeable, as an objective matter, that further questioning would elicit incriminating information about the FIP charges, on which defendant was represented.[5] Indeed, not only was it foreseeable at *281 that point that further questioning might elicit incriminating information about the firearm charges, Gunter explicitly questioned defendant about the firearms underlying those charges, eliciting incriminating information from defendant about how he came to possess those firearms. That questioning was in direct violation of defendant's right to counsel on those charges. Accord Beltran-Solas , 277 Or. App. at 670, 372 P.3d 577 (noting state's concession that officer violated the defendant's rights under Article I, section 11, when the officer directly asked the defendant about charges on which he was *29 represented by counsel during interrogation regarding a separate matter).
"If a defendant is interrogated in violation of his right to counsel under Article I, section 11, any evidence discovered as a result-including evidence of other crimes-must be suppressed unless the state demonstrates that the evidence was not the product of the constitutional violation." Hensley , 281 Or. App. at 534, 383 P.3d 333 ; Savinskiy , 286 Or. App. at 242-43, 399 P.3d 1075. Here, the state does not contend that it has made that showing. Instead, the state makes three different arguments as to why suppression should not be required in this case.
First, the state contends that defendant requested only that the court suppress the entirety of the January 1 interrogation. Thus, the state reasons, even if we were to conclude, as we have, that a portion of the interview should be suppressed, defendant would not be entitled to suppression because "[d]efendant's lone argument was and is that the entire interview is inadmissible." We understand defendant's arguments differently. As set forth above, defendant argued below that, at a minimum, the interrogation should have stopped once it became clear that the interview would involve a discussion of the gun charges, thereby putting at issue whether some portion of the interrogation would need to be suppressed, even if the interrogation was permissible at its outset.
Second, the state contends that defendant validly waived his right to counsel with respect to the FIP charges, as well as with respect to the homicide, because defendant's counsel had told officers that he was withdrawing from the FIP charges. That communication, in the state's view, relieved the state of its obligation to notify counsel before it questioned defendant, even if it was foreseeable that the questioning would elicit incriminating information about the FIP charges. As the state acknowledges, however, there is no authority for that proposition under Oregon law. On the contrary, as the state also acknowledges explicitly, "[u]nder Sparklin , once a defendant has retained an attorney, a person cannot validly waive his Article I, section 11 right to an attorney without having an opportunity to consult with his attorney."
*30 Third, the state argues that, regardless of any violation of defendant's Article I, section 11, rights with respect to the FIP charges, suppression of defendant's statements is not required in this case because, at the time that defendant was questioned, his Article I, section 11, rights had not yet attached with respect to this case. That argument is foreclosed by Savinskiy , in which we rejected an identical argument.
*282 Savinskiy , 286 Or. App. at 243, 399 P.3d 1075 ("Consequently, applying our case law, the state's Article I, section 11, violation mandates the suppression of all the prejudicial statements that defendant made during those interrogations-where defendant's counsel neither attended nor was notified of the interrogations-as well as any prejudicial physical evidence gathered as a result of those interrogations, including any evidence of defendant's then-uncharged conspiracy crimes.").[6]
Accordingly, we conclude that the trial court erred when it denied defendant's motion to suppress his statements in the January 1 interview, to the extent that the motion sought suppression of the statements that defendant made after he told detectives that he thought the Carters set him up on the firearm charges.[7] The remaining question is whether that error was harmless. The state does not contend that it was, and, on our own review, we are unable to conclude that there is "little likelihood that the particular error[s] affected the verdict," State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003), with respect to defendant's conviction for murder. The heart of the dispute at trial was defendant's mental state at the time of the shooting. The evidence of defendant's statements in the interview, on which the state relied in urging the jury to reject defendant's EED and GEI defenses, likely played some role in the jury's rejection of those defenses. As to defendant's remaining convictions, defendant has not developed an argument as to how the *31 evidence likely affected the jury's verdict on those charges, and we see little likelihood that it did. We therefore affirm the judgment as to those convictions.
Conviction on Count 1 reversed and remanded; remanded for resentencing; otherwise affirmed.

Defendant apparently failed to appear at the time for the proceedings on the 1991 and 1994 charges, and warrants were issued for his arrest.

Defendant was charged with several other offenses, but those charges were dismissed.

Defendant raises several other assignments of error. We reject without written discussion defendant's second and third assignments of error, in which defendant contends that the trial court abused its discretion by denying two separate motions for mistrials. Our disposition of the first assignment of error obviates the need to address defendant's fourth assignment of error, which challenges the sentence imposed on the FIP conviction. The record may develop differently in proceedings on remand, which may lead to a different sentencing decision.

Guerrero appears to have had some limited involvement with investigating the FIP charges.

We recognize that Guerrero and Gunter appear to have been under the misapprehension that defendant was not represented on the FIP charges at the time that they interrogated him; there is no indication that they were intentionally attempting to circumvent defendant's right to counsel on those charges. In a footnote, the state suggests that, from the officers' perspective, their mistaken understanding means that, even if it was foreseeable that the questioning would elicit incriminating information about the FIP charges, it was not foreseeable to the officers that petitioner had counsel on those charges. Beyond that footnote observation, however, the state has not developed an argument as to why the misapprehensions of individual state actors should bear on whether the officers' interrogation of defendant about charges on which he, in fact, had counsel violated his rights under Article I, section 11, and there are serious questions about the merits of any such argument. The protections afforded by Article I, section 11, would be seriously undermined if the availability of those protections turned on whether individual state actors had subjective awareness of a defendant's represented status. See Michigan v. Jackson , 475 U.S. 625, 634, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), overruled on other grounds by Montejo v. Louisiana , 556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009) (in the context of the Sixth Amendment, "[o]ne set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court)"); see also Rubalcado v. State , 424 S.W.3d 560, 574 (Tex. Ct. Crim. App. 2014) (concluding that overruling of Jackson in Montejo did not constitute "an abandonment of the rule imputing knowledge to the State" of a suspect's invocation of the Sixth Amendment right to counsel). In the absence of a developed argument by the state on the point, we leave for another day the question of when, if ever, an individual officer's subjective belief that a suspect is not represented by counsel on particular charges bears on whether the officer permissibly may interrogate the suspect about those charges without contacting counsel.

That aspect of our decision in Savinskiy is presently on review in the Supreme Court. In its order allowing review, the Supreme Court allowed review on the specific question, "[i]f the evidence is not admissible to prove the original crimes, is the evidence nonetheless admissible to prove the new crimes?"

To be clear, this means all of defendant's statements reflected in the transcript of the interview after page 21, line 4, which is where Gunter asks defendant about where he acquired the firearms.